UNITED STATES, Appellee,

v.

Ervin F. MOORE, Private First Class,
U.S. Army, Appellant.

No. 52,161.

CM 445536.

U.S. Court of Military Appeals.

Feb. 17, 1987.

For Appellant: *Captain Peter D.P. Vint* (argued); *Captain James J. McGroary* (reargued); *Colonel Brooks B. La Grua, Lieutenant Colonel Arthur L. Hunt, Captain Bernard P. Ingold* (on brief); *Colonel William G. Eckhardt, Major Marion E. Winter, Captain Thomas J. Feeney.*

For Appellee: *Captain Jan M. Wamsted* (argued); *Captain Amaury R. Colon* (reargued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Major Byron J. Braun* (on brief); *Colonel Norman G. Cooper, Lieutenant Colonel Gary F. Roberson, Captain Andrew D. Stewart.*

*Opinion of the Court*

EVERETT, Chief Judge:

Contrary to his pleas, a general court-martial convicted appellant of two specifications of unauthorized absence and six specifications each of larceny and of housebreaking, in violation of Articles 86, 121, and 130, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 921, and 930, respectively. Thereafter, the judge sentenced him to a bad-conduct discharge, confinement for 4 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review affirmed in a short-form opinion.

We granted review to consider appellant's contention that the principal evidence against him on four of the housebreaking and larceny specifications was derived

from an illegal search of his barracks room. We agree.

## I

### A

After a series of housebreakings and larcenies sometime during February and March 1983, at the post library and recreation center at Fort Wainwright, Alaska, notices were published in the post newspaper and elsewhere requesting information on these incidents and indicating that informants could remain anonymous. The items stolen on those occasions included an Apple II microcomputer system, a video cassette player/recorder, a television set, an audio cassette player, videotapes, a bass guitar, two bass amplifiers, amplifier connecting cords, library patron cards, and stereo albums.

At 11:00 p.m. on April 10, an anonymous caller telephoned the military police desk and asked whether any record albums had been stolen during this spree. The desk sergeant did not know the answer, so he asked the informant to call back and then contacted Agent Frank Woods of the Criminal Investigation Command (CID).

When the caller telephoned a half-hour later, the call was forwarded to Agent Woods. He told Woods that a friend whom he refused to identify had found some albums and covers and library cards on the stairwell landing of Building 3401, which was a barracks. Because of the notices, the caller had surmised that the discovered items might be stolen property. Woods responded that he did not know whether albums had been stolen but he would check to find out. After the caller had provided Woods with "a list of numbers" written on the album covers, Woods asked him to call back the next morning at 10:00.

At 7:30 a.m., Agent Woods went to the post library and presented the list of numbers. There, he learned that none of the albums which corresponded to these numbers had been checked out after the break-ins; and so the librarian assumed that they had been stolen during those incidents. However, this conclusion could not be verified, because the library's stock of albums had not been inventoried recently.

Later that day, the caller telephoned Woods again, and he was advised that it appeared that the albums had been stolen. After the caller revealed that he was in Room 303 of Building 3401, Woods, along with Agent Alicia-Diaz, went there to visit him and learned that the caller was a soldier named Horvath. "He was not a [CID] confidential informant," and Agent Woods had had no prior contact with him. Horvath showed the agents the three record albums with records, two empty covers, 15 pink library patron cards, and about 20 plastic album covers. According to Horvath, his anonymous friend had found all these items the previous evening on the stairwell landing.

Upon leaving Horvath's room, Woods and Alicia-Diaz went to the office of Lieutenant Colonel Hale, who commanded the units housed in Building 3401 and who also was the acting post commander. Hale had received information periodically on the pending investigation of the housebreakings and larcenies; and Woods informed him of the most recent developments. Then, Woods told Hale that, because 20 album covers had been recovered on the stairwell landing but only three albums had been found there, he believed that the remaining records were somewhere in the barracks. Accordingly, Agent Woods asked Lieutenant Colonel Hale for permission to search Building 3401 for these records and for the other stolen property related to the unsolved break-ins. As of that time, the investigation had produced leads to several suspects; but neither appellant nor anyone else who lived in the barracks was among them.

Lieutenant Colonel Hale agreed to the request; but he asked the agents to delay the search because the unit was preparing to deploy to the field. Hale indicated they could search for the property they had described to him but imposed no other limitations on the scope of the search. About 3 hours later, the search of Building 3401

began. Most of the stolen items were found in Moore's room; and a consent-search of his room the next day uncovered a stolen set of keys to the library.

The building searched was a standard "arctic" three-story barracks of "cinder-block construction" and housed two companies. The first floor contained offices and company areas, and the second and third floors contained 73 and 64 individual billets, respectively, with these rooms opening off a central corridor. There were no open squad bays in the barracks. The stairwell was "not part of the building itself" but instead was an attached stairwell shielded by corrugated steel. The only outside exit from the stairwell was at the bottom level through a large open area about seven to eight feet across, and there was no door at the exit. Numerous other units were housed in nearby barracks; and, personnel from four or five other units would pass by the stairwell on their way to or from the library.

**B**

At trial, appellant moved to suppress all evidence obtained from his room on the grounds that the search was too general in scope and that, even if the scope of the search were permissible, Lieutenant Colonel Hale had lacked probable cause to authorize it. Both parties filed briefs on the motion; and evidence thereon was received which revealed the previously stated facts.

Thereafter, the prosecution conceded that it could not "seriously contend" that the operation "was an inspection" authorized under Mil.R.Evid. 313(b), Manual for Courts-Martial, United States, 1969 (Revised edition). Instead, trial counsel urged that, under the "totality-of-the-circumstances" test of *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), there was probable cause to believe that stolen property was in the barracks. Defense counsel responded that the court should accept and follow the lead opinion in *United States v. Roberts*, 2 M.J. 31 (C.M.A. 1976), condemning generalized searches as unconstitutional, and that, in any event, the search was supported only by suspicion and conjecture, rather than by probable cause.

Stating that "the court's going to need some more time to consider the question of the barracks search" and observing that it was "an appropriate time to take a ... lunch break," the military judge recessed the court for 2 hours. When court reconvened, the military judge entered extensive findings of fact and on the basis thereof concluded that Lieutenant Colonel Hale had probable cause to believe that stolen items were in the barracks at the time of his authorization. Also, the military judge ruled "that, in the military, that such a search, of an entire barracks, is not, by itself, improper." The judge distinguished *Roberts* by noting that in that case there had existed only "suspicion"—not probable cause to believe—that contraband would be found in the barracks searched. Observing that he was not faced with a situation in which more than one barracks was searched, the military judge ruled that, where probable cause existed to believe that stolen property would be found somewhere in a barracks, a search of the entire barracks was reasonable in the military society.

**II**

**A**

■ In accord with prior usage, *cf. United States v. Middleton*, 10 M.J. 123 (C.M.A. 1981), Mil.R.Evid. 313 authorizes military inspections for the purpose of ensuring the security, discipline, and military fitness of an organization or installation. However, "[a]n examination ... for the primary purpose of obtaining evidence for use in a ... court-martial or ... other disciplinary proceedings is not an inspection within the meaning of this rule." There is nothing in the record which indicates that the search of Building 3401 was—or was intended to be—an inspection. Moreover, at trial the Government conceded that the search could not be justified on this basis.

■ Although an "inspection" under Mil. R.Evid. 313 is probably a "search" for Fourth-Amendment purposes, *cf. Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *United States v. Middleton, supra;* Mil.R.Evid. 314 makes separate provision for "searches not requiring probable cause." However, none of the provisions of this Rule seem to apply to the facts of the present case. The search of Building 3401 was not an entry search, *see* Mil.R.Evid. 314(c); a consent search, *see* Mil.R.Evid. 314(e); or a search within a jail, confinement facility, or a similar facility. Mil.R.Evid. 314(h). No emergency existed within the meaning of Mil.R.Evid. 314(i). No basis exists for concluding that this barracks search falls within the catchall provisions of Mil.R.Evid. 314(k). Accordingly, the search here can only be sustained if it was performed on the basis of "probable cause"—a reasonable belief that the stolen property was then located in Building 3401. *Cf.* Mil.R.Evid. 315(f)(2).

In determining whether information received from an informant constitutes probable cause for a search, two obvious questions come to mind: Is the informant reliable? How does he know about the facts which he has related? *Cf. Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

Some courts interpreted *Spinelli* and *Aguilar* very strictly and ruled that probable cause required proof that the informer was reliable and that he had a basis for knowing the information that he had reported. However, this rather mechanical approach was somewhat inconsistent with *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), which involved an arrest based on information from a reliable informer. That information was held to be sufficient to establish probable cause, even though there was no evidence of how the informer had obtained his information. In the view of a majority of the Justices, this deficiency was overcome by evidence that, prior to the arrest, law-enforcement agents had corroborated certain detailed information provided by the reliable informer.

Similarly, in *United States v. Tipton*, 16 M.J. 283 (C.M.A. 1983), a majority of this Court ruled that probable cause existed when two informants had called in separately about a criminal transaction then underway. Even though there was no other evidence of the reliability of the informers, this Court concluded that the coincidence of calls from two persons who purported to describe the same events in progress adequately demonstrated the reliability of the callers.

Finally, in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, the Supreme Court made clear that probable cause could not be determined in a mechanical way. Instead, the totality of the circumstances must be considered. However, in reaching this conclusion, *Gates* certainly did not announce that the informer's reliability and the source of his knowledge were no longer material in determining probable cause.

## B

■ In the present case, we must be concerned with the reliability of Horvath, the soldier who called Agent Woods. However, even if we assume that Horvath had related accurately to Agent Woods the report received from the anonymous friend, how do we know that the friend was telling the truth? Thus, the reliability of this friend, who claimed to have found the stolen property, is more important than the reliability of Horvath.

Of course, the anonymous friend was not under oath when he told Horvath about finding the albums and other items on the stairwell landing, *cf. United States v. Stuckey*, 10 M.J. 347, 364–65 (C.M.A. 1981); and we do not know whether he had a criminal record or a reputation for lying. Moreover, the fact that Horvath was in possession of the stolen property when he talked to Agent Woods does not tend to show how he got possession of the proper-

ty—and even less does it show how and where the anonymous friend obtained possession.

Even if we assume that Horvath's anonymous friend did find some stolen property on the stairwell landing, this still does not demonstrate that the rest of the stolen property was located in Building 3401. The stairwell was attached to the building and was open. Many persons passed by this barracks who did not reside there; and one of them could readily have placed the property on the landing. Indeed, if a thief was trying to get rid of stolen property, it seems likely that he would have placed it at some spot away from the barracks in which he lived.

If probable cause had been found by a military magistrate, the argument for admissibility would have been stronger. *Cf. United States v. Ventresca*, 380 U.S. 102, 106, 85 S.Ct. 741, 744–45, 13 L.Ed.2d 684 (1965); *United States v. Stuckey, supra* at 365. However, even if a magistrate had been so unwise as to issue a search authorization on such scant evidence, we would still have to hold that probable cause was lacking under the circumstances here.

### C

Even if there had been probable cause to believe that the rest of the stolen property was somewhere within Building 3401, the question would still remain as to whether a search of the 137 separate rooms in the barracks would be reasonable. However, due to our conclusion as to the absence of probable cause, we need not consider whether the search was too general or determine the extent of a soldier's reasonable expectation of privacy with respect to individual dormitory rooms.

### D

Government appellate counsel complain that our decision leaves the Government helpless to maintain discipline in barracks areas. This complaint is lacking in substance. Health and welfare inspections are authorized under Mil.R.Evid. 313. Frequently, consent can be obtained for a

search. Mil.R.Evid. 314(e). If a genuine emergency exists, a reasonable search is permissible. *See* Mil.R.Evid. 314(i). Moreover, further interrogation of the members of a unit may provide enough additional information to establish probable cause.

### E

We conclude that the search was illegal; therefore, the evidence resulting from this illegal search was inadmissible.

### III

The decision of the United States Army Court of Military Review is reversed as to specifications 1–4 of Charges I and II and the sentence; the findings of guilty thereon are set aside. The record of trial is returned to the Judge Advocate General of the Army for submission to the Court of Military Review, which may reassess the sentence based on the remaining findings of guilty or order a rehearing on the affected charges and the sentence.

Judge SULLIVAN concurs.

COX, Judge (concurring in the result):

My reason for writing separately is that I cannot reconcile certain assumptions of the majority opinion with past decisions of this Court with which I agree. In *Murray v. Haldeman*, 16 M.J. 74 (C.M.A. 1983), for example, we held that it was reasonable under the Fourth Amendment to compel servicemembers to produce urine specimens so that they could be tested for evidence of drug use. Citing *Committee for GI Rights v. Callaway*, 518 F.2d 466 (D.C. Cir. 1975), for the proposition that a servicemember's expectations of privacy are fundamentally different (*i.e.,* less) from a civilian's, we obviously discounted the servicemembers' interests in modesty and control over their own body fluids. *Id.* at 81. Further, *United States v. Alleyne*, 13 M.J. 331 (C.M.A. 1982), and *United States v. Harris*, 5 M.J. 44 (C.M.A. 1978), together indicate that installation perimeter searches are permissible under the Fourth

Amendment. Thus, a servicemember commands precious little expectation of privacy as to his or her person and possessions when entering or exiting a military installation. Finally, in *United States v. Middleton*, 10 M.J. 123, 129 (C.M.A. 1981), we condoned that potentially most comprehensive of all searches, the traditional military "health and welfare" inspection, on the ground that the servicemember has no reasonable claim to privacy in his or her barracks room during the progress of such an inspection, notwithstanding the fact that contraband is recognized as a legitimate target of such activity.

With these holdings, to which I thoroughly subscribe, I am unable intellectually to harmonize the implicit assumption in the majority opinion that servicemembers generally have legally enforceable expectations of privacy, *vis-a-vis* their commanders, in barracks rooms. If, at virtually any time and place selected arbitrarily by the commander, servicemembers have no cognizable expectations of privacy as to their bodies, possessions, and rooms, how do they suddenly acquire it when there is a basis for suspicion? The focus of the Supreme Court's debate has always been the *accused's* state of mind, *i.e.* whether *he* has a "legitimate," "justifiable," or "reasonable" expectation of privacy. The state of mind of the *searcher* has no relevance. *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Katz v. United States*, 389 U.S. 347, 352, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Thus, if the commander or his delegee can walk through the door and search the room anytime he wants to for no reason, what sort of expectation of privacy can the servicemember reasonably claim?

Furthermore, it seems logical that the ability to search an area for no particular reason at all is broader than the power to search it only upon the occurrence of some specific, limiting predicate. *Cf. Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Thus, if it is permissible to accomplish the greater act, it should be equally permissible to accomplish that which is included in the greater act. Of course, the significance of all this is that, unless an accused can demonstrate that he had a legitimate expectation of privacy in the subject of the search, he has no claim to the Fourth-Amendment remedy of suppression of the evidence. *See Salvucci, Rawlings, Smith, Rakas, Katz.*

I recognize that this record is ill-suited to assess the actual and societally-approved expectations of privacy in military barracks. *See Smith v. Maryland, supra.* At least since the lead opinion in *United States v. Roberts*, 2 M.J. 31, 36 n.16 (C.M.A. 1976), unilaterally declared that servicemembers have "reasonable expectation[s] of privacy" in their barracks rooms, discussion and factual development of this issue have effectively ceased, and this record is no exception. Therefore, notwithstanding my extreme doubt as to the validity of the basic premise upon which *Roberts* is founded, I am loath to make my own judgment *in vacuo;* hence, I reluctantly concur in the result.* Much water has passed under the bridge in a decade, and, unlikely though it may be, for all I know in the days of this all-volunteer force, military commanders have indeed transferred ownership of the barracks to the troops. In my opinion, reassessment of who does have control of barracks is long overdue, and I eagerly await receipt of an adequately developed record which will permit such reassessment.

---

* I have also examined Mil.R.Evid. 313(b)(*Inspections*), Manual for Courts-Martial, United States, 1984, which is touted as establishing additional restrictions on the commander's ability to exercise dominion over his barracks. I read Mil.R.Evid. 313(b) purely as a rule of inclusion, rather than one of exclusion, and I detect no Presidential intent to erect barriers for commanders higher than those of the Constitution. *See* Mil.R.Evid. 311(a)(2).