UNITED STATES

v.

**Airman Terry R. PARKER, Fr 443–76–1430 United States Air Force.**

**ACM 26760.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 10 Dec. 1987.

21 Sept. 1988.

Appellate Counsel for the Appellant: Colonel Leo L. Sergi, Lieutenant Colonel Richard F. O'Hair, Major William J. Reichart and Captain Paul M. Dankovich.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Major Kathryn I. Taylor.

Before LEWIS, BLOMMERS and KASTL, Appellate Military Judges.

## DECISION

LEWIS, Senior Judge:

Today we reverse findings of guilty and the sentence in a case in which the prosecution evidence consisted of a positive test result of a urine sample obtained in the course of what was intended to be a unit inspection in accordance with Mil.R.Evid. 313(b). The appellant entered a conditional plea of guilty to wrongful use of cocaine. The conditional plea preserves for appellate review his motion to suppress the urinalysis evidence. R.C.M. 910(a)(2).

The appellant asserted at trial that his urine was not properly obtained during a unit inspection within the meaning of the aforementioned rule. Mil.R.Evid. 313(b) defines such an inspection in terms of its "primary purpose." The primary purpose of an inspection is "to ensure the security, military fitness, or good order and discipline of the unit, organization," or other identifiable military entity being inspected. On the other hand, the rule provides that an inspection does not include "[a]n examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings...." Evidence obtained as a result of such an examination is not admissible against an accused, under the cited rule, in a subsequent trial by court-martial. *Unied States v. Austin,* 21 M.J. 592 (A.C. M.R.1985). This is a major distinction that all who deal with unit inspections (or what they believe to be unit inspections) must understand. However, there is a good deal more to Mil.R.Evid. 313(b) than the two broadly worded definitions. Before we attempt to analyze other aspects of the rule in depth it is desirable that we first set forth certain of the material facts as developed during the course of the hearing on the suppression motion.

The appellant was directed to provide a sample of his urine for testing along with fellow members of the carpentry shop pursuant to what was intended to be a "no notice" unit inspection. As best we can determine from the record, approximately 20 military personnel were assigned or attached for duty to this particular work center at the time of the inspection. However, owing to a number of personnel who were absent on leave and temporary duty, only 12 members were present and scheduled for testing. As we shall discuss shortly, one of the members present, a SSgt P., did not provide a urine sample for testing. He was excused from doing so by the squadron section commander who ordered the test.

The squadron section commander's testimony in response to the motion to suppress is particularly critical to our disposition. He stated that he was concerned about rumors and jokes within the Civil Engineering Squadron of chronic drug usage by those assigned to the carpentry shop. There was some basis for such rumors. The witness explained that at least one member of the carpentry shop had received a positive urinalysis during the two most recent inspections conducted of the larger squadron organization. While those who had been previously identified as drug

abusers had been discharged from the service, the rumors and jokes persisted. The witness discerned that this situation was harmful to the morale and welfare of the organization. He felt the need to either identify drug users within the carpentry shop or to clear the reputations of those assigned. He and the squadron commander were considering scheduling an inspection limited to carpentry shop personnel when an incident occurred which hastened that decision. A marijuana cigarette butt ("roach") was found in the parking lot used by the personnel who worked in the carpentry shop. This particular incident, while it was not the sole factor contributing to the decision, was described by the witness as the "last straw."

. Arrangements were made for personnel from the base hospital laboratory to be at the carpentry shop at the beginning of the duty day, 6 July 1987, to collect urine samples from the members who were present for duty. Of those present, two were unable to provide sufficient urine for an acceptable sample. The two were the appellant and the aforementioned SSgt P. The laboratory personnel had other commitments and were, thus, unable to remain at the carpentry shop indefinitely. It was determined that the appellant and SSgt P. would report directly to the laboratory the next morning to provide a urine sample. The appellant did so. His sample was subsequently tested by the standard procedures and determined to be positive for the cocaine metabolite. It was this sample and the testing data that the defense sought to suppress.

SSgt P. did not provide a sample the next morning. The record reflects that he and the squadron section commander spoke to one another at some point following the determination that SSgt P. and the appellant would provide urine the next day. As a result of this conversation the commander advised SSgt P. that he would not be required to provide a sample. He was influenced in this determination by his knowledge that SSgt P. had provided samples on two past occasions and had received a negative urinalysis result in each instance. He was also aware that SSgt P. had a very demanding work schedule. The commander testified that in excusing SSgt P. he was not intending to single out the appellant for drug testing, although he pointed out that to his knowledge the appellant had not been previously tested. The commander confirmed that he had experienced some disciplinary problems with the appellant in the recent past. However, he explained, they were not drug related and did not cause him to suspect that the appellant, specifically, might be a drug user. *See* Air Force Regulation 30–2, *Social Actions Program*, para. 5–8 (Apr 1986.)

Based on this posture of the evidence the military judge denied the motion to suppress. Before doing so he discussed with counsel the question concerning the applicable burden of proof. This, in our view, is the key to a proper disposition of the issue raised by the suppression motion. The issue, as earlier noted, is whether the appellant's urine was collected pursuant to a Mil.R.Evid. 313(b) inspection or as a result of "[a]n examination for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings...." *Id.* In the latter instance, the evidence must be excluded in a trial by court-martial unless it is admissible under another rule. The question becomes one of how the determination is reached as to whether urine was obtained through a unit inspection as opposed to an examination for evidence. More specifically, what is the burden of proof, and who bears it? Although it is not clear to us from the military judge's subsequent findings what burden of proof he applied, we infer that he did not apply the correct one. If he had, we believe that he likely would have reached a different conclusion and would have excluded the evidence.

Mil.R.Evid. 313(b) provides that the government must establish that an examination was an "inspection" within the meaning of the rule by "clear and convincing" evidence if two conditions are satisfied. First, it must be determined whether "a" purpose of an examination is to locate weapons or contraband. When the first

condition is satisfied the clear and convincing standard is triggered if one of the following three factors, any one of which will satisfy the second condition, is present: (1) the examination was directed immediately following a report of a specific offense in the unit and was not previously scheduled; (2) specific individuals are selected for examination; or, (3) persons examined are subjected to substantially different intrusions during the same examination.

■ We conclude that that the first condition was satisfied in this case and is satisfied in all situations where a urinalysis inspection is conducted within a military unit. Such an inspection is specifically designed to determine the location of contraband, or, more precisely, evidence of the use of contraband, i.e., a controlled substance. *See United States v. Johnston*, 24 M.J. 271 (C.M.A.1987). *See also* S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* (1986), pp. 234–235, on production of bodily fluids as facilitating a determination of the presence of contraband. *But see Murray v. Haldeman*, 16 M.J. 74, 82 (C.M.A.1983), for an earlier treatment of the law prior to the amendment of Mil.R.Evid. 313(b) to include orders to produce body fluids. Thus, in all unit urinalysis situations the only issue is whether any of the three factors comprising the second condition is present.

■ What we have said to this point bears repeating so that it will not be misconstrued. We do not mean to imply by our discussion thus far that all, or even most, urinalysis inspections conducted within military units have as their "primary" purpose the potential initiation of courts-martial or other disciplinary proceedings. We emphasize at this point only that urinalysis inspections trigger the first condition of the Mil.R.Evid. 313(b) test. We recognize that military unit inspections designed to locate contraband serve a number of valid purposes. In this regard we concur in the excellent analysis of this general subject by the Army Court of Military Review in *United States v. Rodriguez*, 23 M.J. 896 (A.C.M.R.1987). However, it is

important to note that the validity of what purports to be a urinalysis inspection is subjected to very close scrutiny if any one of the three previously referenced factors which make up the second condition is present. Therefore, we shall examine the facts of this case against each of these factors.

### Examination Directed Immediately Following Report of Offense

■ The squadron section commander's testimony clearly demonstrated that the finding of a marijuana cigarette butt in the vicinity of the carpentry shop was the "last straw," the incident that precipitated the decision for a unit examination, a matter that up to that time had been under consideration but not actually determined. By any fair reading of his testimony, the commander viewed the discovery of this cigarette butt as an indication of possible drug use within the unit to be examined. We find no basis for concluding that command suspicion was specifically linked to any identified person assigned or attached to the unit. Therefore, one might assume a very technical stance and assert that this discovery was not tantamount to the revelation of a "specific offense in the unit." This would be an evasion rather than a rational application of the rule. See our discussion of this aspect of the rule in *United States v. Heupel*, 21 M.J. 589, 591 (A.F.C.M.R.1985). The rule should be interpreted in a manner consistent with its apparent purpose. It is clear to us that the drafters intended that the government be made to satisfy a higher than normal standard of proof in demonstrating that an examination for contraband is a Mil.R.Evid. 313(b) inspection when it is conducted immediately following a reported incident suggesting drug abuse within the unit being inspected.

The question remaining is how "immediately" an inspection must occur after an offense is discovered for the purpose of triggering the clear and convincing standard of proof under the rule. We must view this situation in light of our earlier decision in *United States v. Shepherd*, 24

M.J. 596, 600 (A.F.C.M.R.1987), *pet. denied*, 25 M.J. 238 (1987), wherein we observed: "We do not believe that the drafters of Mil.R.Evid. 313(b) ... intended to fashion a rule that a unit might not conduct a legitimate health-and-welfare inspection if there exists some degree of command suspicion concerning the activities of any of its members." In *Shepherd* we did not consider the triggering of the clear and convincing standard of proof, nor did we believe it necessary to do so. The *Shepherd* inspection was of a firefighters' unit and followed approximately a month after the accused, a member of the unit, had been implicated in an incident that was suspected but not yet confirmed as being drug related. While Shepherd's commander acknowledged that the accused's incident was probably one of the factors he considered in ordering an inspection, he provided a persuasive rationale in support of his overriding concern for the readiness of the military firefighters. For obvious reasons, he considered the firefighters to be personnel who were required to maintain the highest standards of conduct and readiness for hazardous duty. *Id.* at 598.

In the instant case, the appellant's squadron section commander characterized the discovered marijuana cigarette as the "last straw." The military judge found that the command decision to direct a unit inspection was reached "approximately two days after a marijuana roach was found...." We accept his finding. We also note that about another two weeks elapsed until the inspection was actually held so that the necessary coordination with other base agencies could be obtained.

We believe that a respectable argument could be made that the direction for a urinalysis inspection of the carpentry shop occurred as soon after the marijuana cigarette was discovered and identified as could reasonably be expected and, thus, was in relative terms "immediately" thereafter. We recognize that when this factor is found to exist, thereby creating a clear and convincing standard of proof for the government to overcome, an anomalous result may be reached. A commander must be particularly wary of directing a urinaly-sis inspection at the very moment he feels it is most needed. In such circumstance the commander runs the risk of later being found to have ordered an examination for the primary purpose of discovering potential trial evidence. For an enlightening analysis of an analogous situation, see *United States v. Moore*, 23 M.J. 295 (C.M.A.1987) (examination of barracks rooms based on information suggesting that stolen property might be located therein and recovered). On the other hand, we are mindful of the Army Court's admonition that commanders should not be stifled from acting decisively by an "overly restrictive" interpretation of the rule. *United States v. Rodriguez, supra*, 23 M.J. 899, note 5. *See also United States v. Moore, supra*, 23 M.J. at 300, note, where Judge Cox argues that Mil.R.Evid. 313(b) is a rule of inclusion, not exlusion, of evidence. In any event, whether the immediate examination factor was satisfied and, therefore, triggered the clear and convincing standard in this case is an issue we need not determine in view of our later disposition.

### Specific Individuals Selected for Examination

■ Analysis of this factor will not be lengthy. The trial defense counsel argued that the small number of personnel in the carpentry shop, when compared with the larger squadron organization as a whole, along with the large percentage of carpentry personnel who were not present for duty to be tested were circumstances demonstrating an unacceptable selectivity. We do not agree. *See generally, United States v. Shepherd, supra*, in which the same circumstances were present to some extent. We do not believe that the relative size of an organization tested nor the excusal of people not present for duty when the test occurs are circumstances, standing alone, which compromise a unit inspection. We would, of course, examine similar circumstances with a greater degree of skepticism in the light of any evidence that a unit inspection was deliberately timed so as to include certain predetermined individuals while excluding others. *See United States*

*v. Johnston, supra,* 24 M.J. at 275. We have no such evidence before us in this case.

### Examinees Subjected to Substantially Different Intrusions

█ Based on our analysis of the facts we conclude that the validity of the carpentry shop inspection was compromised when the squadron section commander excused SSgt P. from further participation when he was unable to provide a sufficient urine sample. Although he was initially subjected to potential testing, he was afterwards subjected to a different intrusion from others who were required to provide an adequate sample for urinalysis. Thus, there is no denying that the commander discriminated among those finally selected for testing, notwithstanding how reasonable his reasons for doing so might have appeared. The discrimination in treatment between SSgt P. and the appellant is particularly noteworthy for the purpose of this analysis. There is little question that SSgt P. was subjected to a different, and substantially lesser, degree of intrusion than was the appellant. SSgt P. was, indeed, subjected to no intrusion after both members experienced problems in providing a sufficient urine sample during the initial portion of the examination.

█ What was the legal consequence of the squadron section commander's subjective exclusion of a member of the unit? The Court of Military Appeals has observed: "One of the reasons for drafting Mil.R.Evid. 313(b) was to provide guidance to a commander as to what factors might convert an otherwise valid inspection to detect contraband into a subterfuge search for the fruits of a crime." *United States v. Johnston, supra,* at 274. The squadron section commander, in effect, redefined, albeit slightly, the nature and size of the unit to be tested by using subjective judgmental factors in excusing one of the members of the unit before the inspection was completed. We cannot dismiss the fact that he

diminished the size of an already small group of individuals who were present for duty and subject to the inspection. An element of clear discrimination was introduced into the process. As a consequence his motives became subject to question. The second condition of the Mil.R.Evid. 313(b) standard was thereby satisfied. Thus, the government was required to prove by the clear and convincing weight of the evidence that the primary purpose of the purported inspection was not to obtain evidence for use in a court-martial or other disciplinary action.*

The squadron section commander testified to a variety of reasons for directing the unit urinalysis. In such an instance it is difficult to determine whether any given purpose is "primary." When the clear and convincing standard of proof is applied the government is placed in a difficult position of having to prove that the obtaining of evidence for courts-martial or other disciplinary actions was *not* the primary concern. The section commander's testimony was commendably candid in this respect. By his testimony, he was clearly concerned with the potential disciplinary aspects of the examination. On direct examination, he stated, "Basically, you know, the Air Force drug policy is that drug users aren't allowed and this is our way of making sure that there isn't any drug abuse in the squadron. And, if there is, then appropriate action can be taken against individuals who are using drugs." On cross-examination he was asked to reconfirm that he conducted the examination "with an eye toward some type of disciplinary action, possibly court." He replied, "Definitely. I've let it be known through the squadron that if you get caught using drugs, we are going to take action against you." He could hardly have said otherwise. As the Army Court of Military Review has stated: "As a practical matter, a commander who does not recognize the possibility of disciplinary actions arising from a positive urinalysis test is either naive or in engaging

---

* We must emphasize that not every excusal of persons scheduled for testing will lead to the same result. We are not attempting to declare

any such rule by our analysis of the facts in this case.

in deliberate ignorance." *United States v. Rodriguez, supra,* 23 M.J. at 899, note 5.

Are we able to evaluate the squadron section commander's testimony and conclude that it demonstrates by a clear and convincing standard that the primary purpose of the examination was not to obtain evidence for courts-martial or other disciplinary actions? This must be the focus of our analysis. While the witness outlined other purposes for the examination, such as determining the fitness of personnel and maintaining good order and discipline in the organization, no such purpose was clearly identified as "primary." One cannot escape the conclusion, in any event, that one tried and true method of effecting the stated purpose of maintaining good order and discipline in a military organization is by the swift and certain institution of appropriate disciplinary actions against identified offenders. As a matter of fact, at one point the witness was asked by the defense counsel if he would agree that "the basic purpose of the urinalysis is to find the drug user and take actions against them [sic] if they are using drugs." The witness replied, "I'd agree with that, yes." We will not attempt to draw a meaningful distinction between the "basic" purpose and the "primary" purpose.

The squadron section commander, just shortly before responding to the defense counsel's leading question quoted above, explained that it was not sufficient continuously to tell personnel that drugs are illegal and will not be tolerated, "but then you've got to follow through on that and show that, yes, we are going to test you and we are going to prosecute you if you are caught." There is no way we can rationally evaluate the import of this testimony and conclude that it demonstrates by a clear and convincing standard that the appellant's urine was obtained as a result of an "inspection" within the meaning of the rule.

We interpret Mil.R.Evid. 313(b) as we find it, not as we might like it to be. There is, admittedly, a built in anomaly in the rule. Roughly stated, urinalysis evidence derived from a unit inspection becomes ad-

missible in courts-martial only when the inspection was not directed for the primary purpose of obtaining such evidence. However, the lesson to be drawn from this case is not that commanders should endeavor to testify more circumspectly. If we were to suggest this, we would be doing a major disservice to all who read our words. This case illustrates that the rule contains a triggering mechanism which imposes a burden of proof on the government that can be difficult to overcome. Inspections must be conducted in such a manner as to avoid this pitfall if evidence is to be preserved for possible courts-martial.

Finally, and for the purpose of any further appellate review, we find by the clear and convincing weight of the evidence that the appellant was neither specifically suspected of drug abuse nor was he viewed by command authorities as a target of the examination. This was a point that the government stressed at the trial level, but a matter we do not feel is dispositive of the issue in this case. As we interpret Mil.R. Evid. 313(b), a commander need not go so far as to single out specifically identified suspects for testing to raise an inference that an examination for evidence rather than an inspection has been directed. *See generally, United States v. Moore, supra.*

We conclude that the military judge erred in denying the motion to suppress. Given this disposition, the findings of guilty and the sentence are set aside. A rehearing may be ordered. *See* R.C.M. 910(a)(2). If a rehearing is not deemed to be feasible or practical, the convening authority should dismiss the charge and specification.

Judge BLOMMERS and Senior Judge KASTL concur.