UNITED STATES, Appellant,

v.

Frank J. LOPEZ, Staff Sergeant
U.S. Air Force, Appellee.

No. 66,675.
ACM 28069.

U.S. Court of Military Appeals.

Argued Jan. 7, 1992.
Decided Aug. 12, 1992.

For Appellant: *Captain Thomas E. Wand* (argued); *Lieutenant Colonel Brenda J. Hollis* and *Major Paul H. Blackwell, Jr.* (on brief).

For Appellee: *Major John V. Sullivan* (argued); *Colonel Jeffrey R. Owens* and *Major Ronald G. Morgan* (on brief).

*Opinion of the Court*

CRAWFORD, Judge:

The accused was convicted by general court-martial of unlawful possession and use of ration cards and theft of three ration cards, in violation of Articles 92 and 121, Uniform Code of Military Justice, 10 USC §§ 892 and 921, respectively. The accused moved to suppress the ration cards on the ground that they had been illegally seized. When this motion was denied, he entered conditional pleas of guilty to all Charges and specifications. He was sentenced to a bad-conduct discharge and reduction to E–1. The Court of Military Review, over the dissent of Chief Judge O'Brien, reversed the military judge's denial of the motion to suppress and dismissed the charges. 32 MJ 924 (1991). The Judge Advocate General certified this decision to us for review. *See* 35 MJ 46. We reverse.

All five judges agree that a good-faith exception to the exclusionary rule applies to this commander.

I

The accused was a noncommissioned officer stationed at Torrejon Air Base, Spain, "in charge of his unit orderly room" and had the responsibility of "issuing ration cards to members of his squadron." These ration cards authorized "patrons to purchase items, in limited quantities," from "various tax-exempt shops run by the U.S. military in Europe."

On April 4, 1989, the Air Force Office of Special Investigations (OSI) "received a complaint that" the accused probably had "been abusing his ration card privileges." *Id.* at 926. After it became apparent that OSI was taking no action on the report, the complainant forwarded it to the security police at the air base on May 10, 1989.

On May 11, 1989, Technical Sergeant McKinnon from the security police went to the accused's commanding officer, Major Joe Frederick Harrison, and told him that he had received reports from two cashiers at the commissary that the accused

"was using more than one ration card," *id.* at 926, and was buying numerous amounts of cigarettes several times a week. Major Harrison knew that the accused was the individual who issued ration cards and that the accused had had financial difficulties in January 1989. Based on this information, Major Harrison thought that the documents used to issue the ration cards would be found in the accused's desk,[1] and that one ration card would be on his person and additional cards would be found in his car or dormitory room. Thus, he authorized a search of the office desk, car, dormitory room, and person of the accused. Before authorizing the search, he called the base staff judge advocate (SJA) to see if he had probable cause for the search. The SJA indicated that this information was sufficient for a search authorization. Sergeant McKinnon did not tell Major Harrison that the information from the cashiers was obtained 5 weeks earlier, *id.* at 926, but he did indicate that this was an ongoing activity by the accused. He also did not tell the commander anything about the cashiers. At trial the military judge denied the defense motion to suppress but held that the ration cards seized from the accused were only admissible under the good-faith exception, citing Mil.R.Evid. 311(b)(3), Manual for Courts–Martial, United States, 1984 (Change 2).

## II

■ An impartial commander may authorize a search based on probable cause. Mil.R.Evid. 315(f)(2) provides, "Probable cause to search exists when there is a reasonable belief that the ... property ... sought is located in the place ... to be searched." In determining whether there is probable cause the commander will apply the totality-of-the-circumstances test of *Illinois v. Gates,* 462 U.S. 213, 233, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). *See United States v. Tipton,* 16 MJ 283, 286 (CMA 1983). While *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723

(1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), were rejected by the Supreme Court as being unduly "rigid," 462 U.S. at 231, 103 S.Ct. at 2328, the *Aguilar–Spinelli* test still is "highly relevant in determining" probable cause. *Id.* at 230, 103 S.Ct. at 2328. Otherwise, a magistrate is left "to rely on common sense." *Id.* at 274, 103 S.Ct. at 2351 (White, J., concurring in the judgment).

■ As indicated, the timeliness of the information and the relationship between the crime objects and place to be searched are aspects of the probability test. Timeliness of the information is considered differently in determining whether there is probable cause to apprehend or whether there is probable cause to search. Once it is shown that probable cause for apprehension exists, the probable cause will exist for weeks or months absent intervening exculpatory facts. *United States v. Watson,* 423 U.S. 411, 432 n. 5, 96 S.Ct. 820, 832 n. 5, 46 L.Ed.2d 598 (1976) (Powell, J., concurring). In contrast, probable cause to search a place does grow stale with the passage of time. In such a situation, the passage of time at some point results in the likelihood that the goods will no longer be in the original location. Whether too long a period has elapsed from the time the facts are obtained until the search is authorized depends on many factors. One is the location involved: *United States v. Land,* 10 MJ 103 (CMA 1980) (2 or 3 days for "substantial" quantity of hashish to be in accused's apartment not too stale). Another is the type of crime: *Rugendorf v. United States,* 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964) (Court seemed to assume that large quantities of stolen property not readily disposable will remain in a location for at least 6 days); *United States v. Queen,* 26 MJ 136 (CMA 1988) (in view of threat of imminent death to subordinate, delay of 2 or even 6 weeks after sighting pistol to obtain it from the accused's ve-

---

**1.** The examination of the desk to audit the books and to determine any discrepancy in the ration control cards procedure may be conduct-

ed on less than probable cause. *Cf. O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

hicle, not untimely, distinguishing *United States v. Bright,* 2 MJ 663 (AFCMR 1976)). A third is the nature of the articles seized: *United States v. Johnson,* 23 MJ 209 (CMA 1987) (25–day delay before seizing stereo not too stale—unlike drugs). The last factor is how long the crime has been continuing: *Andresen v. Maryland,* 427 U.S. 463, 478 n. 9, 96 S.Ct. 2737, 2747 n. 9, 49 L.Ed.2d 627 (1976) (3–month delay not too stale when dealing with complex real estate scheme); *United States v. Harris,* 403 U.S. 573, 579 n. *, 91 S.Ct. 2075, 2079 n. *, 29 L.Ed.2d 723 (1971) (plurality opinion) (2–week delay not too stale when dealing with moonshining over a 2–year period). In summary, the information considered by the individual authorizing a search must make it more probable than not that the item is located at the place to be searched.

■ The other factor to be considered by the authorizing official is the relationship that exists between the crime, objects, and place. This is another difference between probable cause to search as compared to probable cause to apprehend. Probable cause to apprehend does not require establishment of a nexus between the individual to be apprehended and any object or place. However, in order to establish probable cause to search, there must be probable cause to believe that the items connected with criminal activity are located at the place or places to be searched. In a foreign country where there has been a recent taking of property, such as a stereo with no distinctive markings, there is an inference that the property will be either at the residence, barracks, or home of the individual. *United States v. Johnson,* 23 MJ at 212. *See also United States v. Barnard,* 23 USCMA 298, 49 CMR 547 (1975); *United States v. Alexander,* 835 F.2d 1406, 1409 (11th Cir.1988) ("Because Alexander had been driving the car in the days after the robbery, a reasonably prudent person would believe that the revolver and additional dye-stained money were in the car.") (footnote omitted); *United States v. Fannin,* 817 F.2d 1379, 1382 (9th Cir.1987) (reason to assume drugs at defendant's residence).

■ As demonstrated by the court below, the existence of probable cause was very close. We need not determine if there was sufficient probable cause. Because there was more than a "bare bones" presentation of facts to Major Harrison, we hold that the good-faith exception to the exclusionary rule applies.

### III

■ The military, like the Federal and state systems, has hierarchical sources of rights. These sources are the Constitution of the United States; Federal Statutes, including the Uniform Code of Military Justice; Executive Orders containing the Military Rules of Evidence; Department of Defense Directives; service directives; and Federal common law. Unlike the Federal Rules of Evidence, Section III of the Military Rules of Evidence "codifies" the constitutional rules. Normal rules of statutory construction provide that the highest source authority will be paramount, unless a lower source creates rules that are constitutional and provide greater rights for the individual; for example, Mil.R.Evid. 305(e) as to notice to counsel, or Article 31, UCMJ, 10 USC § 831, requiring warnings to suspects not in custody.

In 1986 the President set forth the good-faith exception in Mil.R.Evid. 311(b)(3), Manual, *supra* (Change 2). This rule specifically applies regardless whether the search authorization is by a judge, a magistrate, or a commander. The rule does not distinguish between affidavits or unsworn statements, and it is not limited to written authorizations. The Drafters' Analysis to the rule states: "The rationale articulated in [*United States v.* ] *Leon* [, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ] and [*Massachusetts v.* ] *Sheppard* [, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) ] that the deterrence basis of the exclusionary rule does not apply to magistrates extends with equal force to search or seizure authorizations issued by commanders who are neutral and detached, as defined in

*United States v. Ezell,* 6 MJ 307 (CMA 1979)." Manual, *supra* at A22–17 (Change 2). In addition to examining whether the particular commander evidenced neutrality, other considerations in determining whether to apply the good-faith exception may include those enumerated in the Analysis: "the level of command of the authorizing commander; whether the commander had training" on search and seizures rules; "whether the rule governing the search or seizure being litigated was clear; whether the evidence supporting the authorization was given under oath; whether the authorization was reduced to writing; and whether the defect in the authorization was one of form [over] substance"; as well as "whether the commander received the advice of a judge advocate prior to" giving the search authorization. *Id.* at A22–17.

The Courts of Military Review have split on the question whether to extend the good-faith exception to search authorizations issued by commanders. *United States v. Mix,* 32 MJ 974, 983 (ACMR 1991) (applied); *United States v. Lopez,* 32 MJ 924 (AFCMR 1991) (rejected); *United States v. Postle,* 20 MJ 632, 642–47 (NMCMR 1985) (applied).

Let us contrast and compare search authorizations issued by commanders and warrants issued by judges and magistrates. Each require probable cause and issuance of the authorization by a neutral and detached official. Whether an oath is required is dependent upon service regulations. This Court has "recognized the unique 'truth-telling effect' of an identified servicemember's giving information in the presence of a superior officer." *United States v. Tipton,* 16 MJ at 287. Clearly, false information given to any authorizing official may form the basis of a false official statement chargeable under Article 107 of the Code, 10 USC § 907.

■ One of the requirements of the good-faith exception is that the authorizing official be neutral and detached. The aim of requiring the neutral and detached magistrate is to impose an orderly process and prevent the magistrate from representing a law enforcement interest while at the same time authorizing searches and seizures. On a number of occasions the Supreme Court has struck down search warrants when they were not issued by neutral and detached magistrates. *See Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 327, 99 S.Ct. 2319, 2324–25, 60 L.Ed.2d 920 (1979) (warrant issued by justice of the peace who allowed himself to become a member of the search party); *Coolidge v. New Hampshire,* 403 U.S. 443, 450, 453, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564 (1971) (warrant issued by state Attorney–General acting as chief prosecutor); *Mancusi v. DeForte,* 392 U.S. 364, 371, 88 S.Ct. 2120, 2125, 20 L.Ed.2d 1154 (1968) (subpoena *duces tecum* issued by a district attorney). While the issuing authority must be neutral and detached, there is no constitutional requirement that the person have some minimal legal or educational qualifications, or even that the issuing authority be a lawyer. *Shadwick v. City of Tampa,* 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972). But the Court emphasized that the issuing official must be neutral and detached and must be capable of determining whether probable cause exists.

Historically the Fourth Amendment was designed to protect individuals from the King's messengers and colonial customs officials. 10 *Life and Works of John Adams* 276 (1856). There was no requirement that a commander be neutral and detached. In fact, the commander was thought to have "plenary power," *United States v. Worley,* 3 CMR (AF) 424, 442 (Judicial Council 1950), quoted in *United States v. Florence,* 1 USCMA 620, 623, 5 CMR 48, 51 (1952). It was not until 1959 that we ruled that a commander must have probable cause to search. *United States v. Brown,* 10 USCMA 482, 28 CMR 48 (1959). Judge Latimer dissented, arguing that the issue is reasonableness and not whether a commander had probable cause. *Id.* at 489, 28 CMR at 55. Despite his argument, Manual for Courts–Martial, United States, 1969 (Revised edition) (in para. 152), and 1984 Manual, *supra* (in Mil.R.Evid. 315(f)) have

required probable cause. The 1984 Manual (Mil.R.Evid. 315(d)) added the requirement of impartiality which was intended to incorporate the neutral-and-detached standard of *United States v. Ezell*, 6 MJ 307 (CMA 1979).

■ A commander who orders an investigation may be disqualified from authorizing a search, but asking for "additional information" is not disqualifying. *United States v. Ezell*, 6 MJ at 319. Likewise, where a search authorization is motivated by revenge, *United States v. Ezell*, 6 MJ at 307, or vindictiveness, *United States v. Staggs*, 23 USCMA 111, 113, 48 CMR 672, 674 (1974), a commander will be disqualified. But when the commander is drawing on knowledge derived as part of routine administrative matters, he or she will not be disqualified, *United States v. Rushing*, 11 MJ 95, 97–98 (CMA 1981). In *Rushing* the authorizing commander was not disqualified because he was aware of the accused's prior record of conduct and knew who reported the accused for substance abuse or because he initially instructed the agents to ask for permission to search the accused's person. Likewise, the commander in *United States v. McCarthy*, 7 MJ 42, 43 (CMA 1979), was not disqualified because he had previous knowledge that the accused "was awaiting trial for drug charges ... and that several informants had reported" the accused "as being involved in drug activity."

■ The change to the Manual adopting the good-faith exception recognizes that the commander must be impartial. This language, incorporating the requirement of *Ezell*, is important because it recognizes that there is a difference between a commander with his or her various roles and a civilian magistrate. Additionally, it is an implicit recognition that the Supreme Court has never expressly applied the Bill of Rights to the military, but has assumed they applied.[2] It has in the past recognized the differences between the military and the civilian community that result from "the primary business of armies and navies [being] to fight or be ready to fight wars should the occasion arise." *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955). "An army is not a deliberative body. It is the executive arm. Its law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier." *Parker v. Levy*, 417 U.S. 733, 744, 94 S.Ct. 2547, 2556, 41 L.Ed.2d 439 (1974), quoting *In re Grimley*, 137 U.S. 147, 153, 11 S.Ct. 54, 55, 34 L.Ed. 636 (1890).

■ In any event, the good-faith exception will not apply when part of the information given to the authorizing official is intentionally false or given with "reckless disregard for the truth." It will also not apply where "no reasonably well trained

2. F. Gilligan and F. Lederer, *Court–Martial Procedure* § 1–52.00 at 26 (1991): "Scholars have differed as to whether the Bill of Rights does apply to the armed forces. Strangely enough, in one sense the question remains open. Although the Supreme Court has *assumed* that most of the Bill of Rights does apply, it has yet to squarely hold it applicable." (Footnotes omitted.)

But since *United States v. Jacoby*, 11 USCMA 428, 430–31, 29 CMR 244, 246–47 (1960), this Court has held that the Bill of Rights apply, "except those which are expressly or by necessary implication inapplicable." The right to indictment by grand jury is expressly made inapplicable to members of the armed forces, U.S. Const. amend. V, and this Court has held that the Fourth Amendment oath requirement does

not apply. *United States v. Stuckey*, 10 MJ 347 (CMA 1981). However, servicemembers enjoy numerous rights that are not available to defendants in the state or federal criminal justice system. For example, they are entitled to be notified of the nature of the offense before there can be a valid waiver under Article 31(b), Uniform Code of Military Justice, 10 USC § 831(b), and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). They also are entitled to counsel at the very early stages of the criminal process and throughout the appellate process, regardless of indigency. *See, e.g., United States v. Wattenbarger*, 21 MJ 41 (CMA 1985), *cert. denied*, 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986). Finally, they are generally entitled to verbatim records of trial, regardless of indigency. Art. 54, UCMJ, 10 USC § 854.

officer should rely on the warrant." The exception also will not apply when the "affidavit [is] 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Finally, it will not apply when the authorization "may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984).

These exceptions to the good-faith rule apply to search authorizations by commanders. Certainly Major Harrison was neutral and detached within the meaning of *Ezell*. Major Harrison was not motivated solely by revenge[3] or vindictiveness.[4]

■ Next we analyze the factors set forth in the Analysis. In this case the information given to the commander and the testimony given at this trial were not models of clarity. This case emphasizes the need for training on search authorizations and probable cause for apprehensions. This training requirement is not new, as the Court in *Shadwick* indicated the issuing official must not only be neutral and detached, but also must understand probable cause. This case would not preclude the good-faith exception from applying because of the lack of training. Just who this well-trained officer is is still being fleshed out. At the very least, the officer must be familiar with well-established principles. *See United States v. Hale*, 784 F.2d 1465 (9th Cir.), *cert. denied*, 479 U.S. 829, 107 S.Ct. 110, 93 L.Ed.2d 59 (1986); *United States v. Weinstein*, 762 F.2d 1522 (11th Cir.1985), *cert. denied*, 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986). As to probable cause, it is "highly relevant" that the commander applied the *Aguilar–Spinelli* test. *Illinois v. Gates*, 462 U.S. at 230, 103 S.Ct. at 2328; Mil. R.Evid. 315(f), Drafters' Analysis, Manual, *supra* at A22–27 (Change 2). It is finally very significant that the commander acted only after consulting the local SJA.

We hold that the good-faith exception is applicable to the authorization by Major Harrison. He was an impartial authorizing official; there was a substantial basis for finding probable cause; and the authorization was reasonably relied upon by the executing officials. Clearly, those conducting the searches acted in good faith by relying on what this rational commander did under the circumstances known to him.

The decision of the United States Air Force Court of Military Review dismissing the charges is reversed. The record of trial is returned to the Judge Advocate General of the Air Force for remand to that court for further review.

Judge GIERKE concurs.

COX, Judge (concurring with modest reservations):

For some time now, I have been "urg[ing] a fresh look at the proper application of the Fourth Amendment to ... [military] society." *United States v. Morris*, 28 MJ 8, 14 (CMA 1989) (Cox, J., concurring in part and dissenting in part); *see also United States v. Moore*, 23 MJ 295, 299–300 (CMA 1987) (Cox, J., concurring in the result). Recently, in *United States v. Alexander*, 34 MJ 121, 127–28 (CMA 1992) (Cox, J., concurring in the result), I tried again. The instant case presents yet another opportunity. Unfortunately, the majority remains attached, verbally, to doctrines intended for Mainstreet, USA, not military organizations. I have no doubt

---

**3.** *United States v. Ezell*, 6 MJ 307 (CMA 1979). Boswell's commander testified that earlier he had conducted a search and the evidence could not be used since he "blew" the search. *Id.* at 321. Ezell's commander was not disqualified even though he said that he had approved an administrative discharge for the accused and did not want him to remain in the unit. *Id.* at 320.

**4.** *United States v. Staggs*, 23 USCMA 111, 113, 48 CMR 672, 674 (1974): "'[W]e'd been after him' for some time." The staff judge advocate was held disqualified for this and other factors. *Cf. United States v. Ezell*, 6 MJ at 320 n. 45: The commander, who was not held to be disqualified, said, "We never had any hard evidence that he was involved in drug traffic before that we were able to prosecute or anything."

that the Fourth Amendment has meaning and protects servicemembers everywhere from arbitrary or unlawful actions of military authorities. My disagreement with our prior holdings stems from their mechanical application of doctrine arising in a civilian context to cases arising uniquely in the military context.

As the lead opinion notes, this dialogue first jumped off track in *United States v. Brown*, 10 USCMA 482, 488, 28 CMR 48, 54 (1959), wherein a majority of two invented the requirement that a military commander must have what it termed "[r]easonable or probable cause" in order to authorize what it termed an "apprehension" and "search." [1]

Within a few short years, the majority had "equated" the commander to a federal magistrate:

> Power to authorize a search is within the province of the commanding officer.... Paragraph 152, Manual for Courts-Martial, United States, 1951. In this context he stands in the same relation *vis-a-vis* the investigating officer and an accused as the Federal magistrate. *And we have so equated him. United States v. Ness*, 13 USCMA 18, 32 CMR 18; *United States v. Battista*, 14 USCMA 70, 33 CMR 282; *United States v. Davenport*, 14 USCMA 152, 33 CMR 364.

*United States v. Hartsook*, 15 USCMA 291, 294, 35 CMR 263, 266 (1965) (emphasis added). *Cf. United States v. Fimmano*, 8 MJ 197 (CMA 1980) (Fourth Amendment "requirement ... that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation'" applies with equal force to command-ordered "search").[2]

It was but a small step to declare the commander a virtual trespasser in his own barracks. *E.g., United States v. Thomas*, 1 MJ 397 (CMA 1976); *United States v. Roberts*, 2 MJ 31 (CMA 1976); *United States v. Ezell*, 6 MJ 307 (CMA 1979).

Predictably, any time it appeared in sublime appellate hindsight that commanders in the field did not look, talk, think, and act like enchambered legal scholars, those command actions were deemed tainted, and all resulting evidence was barred from courts-martial. *E.g., United States v. Ezell, supra*. Even the most fundamental obligation of military command—the duty to inspect the forces to ensure mission preparedness—was severely and unrealistically curtailed; only the most superficial range of tangible items could be examined in the name of a military inspection—every other sort of examination quickly being branded a mere "subterfuge" for a search. *United States v. Thatcher*, 28 MJ 20, 24 (CMA 1989); *United States v. Johnston*, 24 MJ 271, 274 (CMA 1987). *Compare United States v. Middleton*, 10 MJ 123 (CMA 1981), and *United States v. Moore, supra* at 295–99, *with United States v. Alexander, supra* at 127–28, and *United States v. Moore, supra* at 299–300 (Cox, J., concurring in the result).

In 1980 the President, no doubt under duress of this Court's campaign, promulgated various rules of evidence for the armed forces. In part, these rules reflected the then-existing Fourth Amendment holdings of this Court, which in turn applied literalistically the civilian-community-based Supreme Court holdings. *See* Chapter XXVII, Military Rules of Evidence, Manual for Courts-Martial, United States, 1969 (Revised edition) (Change 3). With few notable exceptions, *e.g., United States v. Stuckey*, 10 MJ 347 (CMA 1981); *Murray v. Haldeman*, 16 MJ 74 (CMA 1983), the dialogue remains largely unchanged—this case included.

In my view, history has merely confirmed the wisdom of Judge Latimer's original dissent in *Brown*, wherein after a lengthy recitation of military authorities, he observed:

---

1. It should be noted that the initial selection of terminology such as "search," "apprehension," or "inspection" tends to be outcome-determinative.

2. Both the claim that commanders stood on the same footing as federal magistrates and the oath/affirmation requirement were later abandoned in *United States v. Stuckey*, 10 MJ 347, 360–61 (CMA 1981).

I do not contend a commanding officer has unlimited power to search members of his command, but I do assert he is not circumscribed by all the refinements applied in civilian cases. He has many occasions, other than searches to obtain incriminating evidence, which justify orders to search members of his command while on station. These are not present in the civilian community and, under any conceivable theory, it is only when his orders to search or seize cannot be considered reasonable that they are unlawful. What constitutes a reasonable search depends upon the facts and circumstances of each individual case, and in the military there are many factors which must be considered.

The word "reasonable" as it must be interpreted in military law is not limited to those situations where the commander has probable cause to believe a particular person possesses contraband and he alone can be searched. If it were so limited, then the civilian doctrine might be applicable. But it must be remembered that a commanding officer has the duty to maintain law and order and to protect the welfare, health, well-being, and safety of the command. He cannot sit idly by and await positive information that offenses are being committed. He has an obligation to prevent any misbehavior which will impair the efficiency and good order of his command. Surely the captain of a ship is not required to allow liquor or drugs to be smuggled aboard because he cannot fix with certainty the particular culprit. While a civilian can be denied the right to board the ship, under ordinary circumstances a member of its complement may not, and searching is the only effective way to reach the evil if the smuggling is being done by sailors. The same principle is involved when Army or Air Force personnel come on station. Therefore, in order to determine whether a commander has reasonable cause to order a search, consideration must be given to his duties and responsibilities to maintain a combat ready outfit, and his judgment should not be questioned unless he clearly abuses his authority.

10 USCMA at 492–93, 28 CMR at 58–59 (citations omitted).

In *United States v. Stuckey*, 10 MJ at 359–60, then-Chief Judge Everett echoed the reasonable-commander theme, observing:

A military commander has responsibilities for investigation and for law enforcement that a magistrate does not possess. Also, he has responsibilities for the welfare and combat readiness of the personnel under his command. The commander's responsibilities with respect to an installation or area over which he has command give him the power to deny entry to persons who do not submit to a search at the gateway. Similarly, these responsibilities provide the commander with a basis for curtailing the exercise of First Amendment rights within the area under his command. Paragraph 152 of the [1951 and 1969] Manual for Courts-Martial, in which the President empowered commanders to authorize searches and seizures as to persons and property under his command, was not promulgated because the commander could by legalistic legerdemain be transmuted into a magistrate; but instead this was done because, in light of the responsibilities imposed upon the commander, it was reasonable to give him this power.

In promulgating paragraph 152 of the Manual the President may also have recognized that inherent in the command structure are some safeguards against a commander's indiscriminate invasion of the privacy of his subordinates. For one thing, combat readiness of troops depends in large part upon their motivation, but discipline and punishment cannot alone develop the necessary motivation. Leadership is also required, and one aspect of successful leadership is concern for the welfare of subordinates. Loyalty in a military unit, as in other organizations, is a two-way street. A commander who approves—or even tolerates—arbitrary invasions of the privacy

of his subordinates is not demonstrating the brand of leadership likely to command the loyalty or produce the high morale associated with a combat-ready organization. Accordingly, a commander has some incentive to act reasonably and with sound judgment in acting on requests for searches and seizures which involve his personnel. Moreover, repeated failures by a commander to respect the Fourth Amendment rights of his troops might become a basis for a "complaint of wrongs" under Article 138 of the Uniform Code, 10 USC § 938, or, in the extreme case, even for a prosecution for dereliction of duties as a commander. *See* Article 92, UCMJ, 10 USC § 892.

(Citations and footnotes omitted.)

Albeit with limitations, our cases have long since recognized the uniqueness of "searches and seizures" in the military community. Without much difficulty, we readily acknowledge at least four major variances from conventional Fourth Amendment doctrine:

First, there is no requirement in the military that the commander who issues a search authorization be a judicial officer: "The commander's power to authorize searches of places and persons under his control exists—to whatever extent it does exist—because it complies with the Fourth Amendment's basic norm of reasonableness." *United States v. Stuckey*, 10 MJ at 361. Indeed, the very term, "neutral and detached commander," would be an oxymoron, for how can a person "command" a military unit and still be detached, disinterested, and neutral?

Second, there is no military requirement that the search authorization "be in writing." *United States v. Stuckey*, 10 MJ at 358, 360–61; *see United States v. McClain*, 31 MJ 130, 134 (CMA 1990). A verbal search authorization which satisfies the requirement for particularization will suffice.

Third, there is no requirement for an oath or affirmation. *United States v. Stuckey*, 10 MJ at 361.

Fourth, the most pervasive of all general searches—the "military inspection"—may be conducted utterly without probable cause and without the particularization required for a warrant. *United States v. Middleton*, 10 MJ 123 (CMA 1981).

My position is simple. The Fourth Amendment only protects military members against unreasonable searches within the context of the military society. *See Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986). Something as drastic as a "shakedown inspection" can only be justified in the military because of the overriding need to maintain an effective force. Likewise, preemptive strikes on drugs and other dangers can only be reasonable because of their impact on the mission. *See United States v. Alexander* and *Murray v. Haldeman*, both *supra*. The United States Court of Military Appeals has the obligation to ensure that inspections, searches, and seizures in the military society are reasonable in their inception and in their conduct. This means that commanders must have rules which are honest, simple, forthright, and easy for both the commander and the commanded to understand.

Thus, I urge a relook at the Military Rules of Evidence.[3] It seems to me that

---

3. Manual for Courts-Martial, United States, 1984. As I read Mil.R.Evid. 313 ("Inspections and inventories in the armed forces"); 314 ("Searches not requiring probable cause"); and 315 ("Probable cause searches"), they are only mirages anyway—traps for the unwary. Indeed Mil.R.Evid. 314(k) itself contains the exception that swallows these "rules," stating: "A search of a type not otherwise included in this rule and not requiring probable cause under Mil.R.Evid. 315 may be conducted when permissible under

the Constitution of the United States as applied to members of the armed forces."

In other words, unless we are to ignore plain meaning, if the "search" does not make it as a Mil.R.Evid. 313 "inspection," or as a Mil.R.Evid. 315 "probable cause search," or as one of the recognized exceptions listed under Mil.R.Evid. 314, the results of the search are still admissible if the search was constitutional. Thus, the results of constitutional searches are not subject to exclusion under the Military Rules of Evidence. Neither, it goes without saying, can the

very simple rules would suffice to balance Fourth Amendment protection with the realities of military society. If the commander acted reasonably in authorizing a "search," given the time, place, circumstances and information available to him, then the fruits of that intrusion should not be suppressed. "Stated another way," as I expressed it in *United States v. Morris*, 28 MJ at 18, "if the commander would have been remiss in failing to act to abate the potential threat to the installation, personnel, and mission, then the evidence should not be suppressed." Whether the commander acted reasonably will be determined in the first instance by military judges who must rule on objections to evidence seized. I give the word "reasonable" its ordinary meaning, *i.e.*, "agreeable to or in accord with reason or sound judgment; logical ... not exceeding the limit prescribed by reason; not excessive: ... endowed with reason ... capable of rational behavior, decision...." *The Random House College Dictionary* 1100 (1980 rev. ed.). Another way of saying it is that reasonable is that which is founded upon a reason.[4]

As I read the lead opinion in this case, the bottom line is that this commander had ample reason to authorize the search; so

Rules cause evidence to be admitted in a court-martial if the Constitution forbids it. Hence, Mil.R.Evid. 313–15 are not "rules" at all, but at best a restatement of the rules; the rule is the Constitution. I certainly agree that servicemembers, commanders, military police, and military justice practitioners should have up-to-date materials on constitutional law. However, I suggest it is time to de-Manualize these provisions because people keep trying to "apply" them, thinking they are rules.

4. Criminal-justice systems deal with the concept of reasonableness everyday, for none can be convicted unless the trier of fact is convinced beyond a reasonable doubt of the accused's guilt.

5. Given that ration control was one of the accused's military duties, it is highly probable that the commander's actions amounted to a simple military inspection. *United States v. Alexander*, 34 MJ 121, 127–28 (CMA 1992) (Cox, J., concurring in the result).

6. I believe technical doctrines such as the "good-faith exception" should not be forced to fit mili-

did the police officer conducting the search. Indeed, everyone acted in good faith. Clearly, the commander acted reasonably in authorizing and conducting the "search."[5] Although I do not believe that *the* "good-faith exception" created in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), is apropos to command-ordered searches and seizures,[6] the reasoning advanced by Judge Crawford in reaching her conclusions is sufficiently analogous to my view to permit me to concur with her that this search was carried out in good faith and was reasonable under the Fourth Amendment.

SULLIVAN, Chief Judge (concurring in the result):

The certified issues in this case are:

## I

DID [THE ACCUSED'S] COMMANDER ACT IN A NEUTRAL AND DETACHED MANNER IN AUTHORIZING THE SEARCH OF [THE ACCUSED'S] BARRACKS ROOM FOR CONTRABAND RATION CONTROL CARDS?

## II

DID [THE ACCUSED'S] COMMANDER HAVE A SUBSTANTIAL BASIS FOR

tary commanders, Mil.R.Evid. 311(b)(3) notwithstanding. I appreciate that the President added Mil.R.Evid. 311(b)(3) in an attempt to restore some measure of realism to command authority. However, *Leon* stands for the proposition that the fruits of a police search are admissible at trial, even though some defect in the warrant is later discovered, provided the search was conducted in good faith by law enforcement officials acting pursuant to a facially valid search warrant issued by a neutral and detached magistrate or judge. Thus *Leon* is grounded upon justifiable police reliance on the legal conclusions of the recognized legal authority of the magistrate or judge. I believe it is both unrealistic and unnecessary to extend this doctrine to commanders, whose training and role ordinarily in no way resembles that of a magistrate or judge. As to the latter point, I agree with then-Chief Judge Everett's view of the applicability of the *Leon* doctrine to the military, in light of the role of a commander *vis-a-vis* a magistrate. *See United States v. Morris*, 28 MJ 8, 12 (CMA 1989).

DETERMINING THE EXISTENCE OF PROBABLE CAUSE, AND DID THE OFFICIALS SEEKING AND EXECUTING THE SEARCH AUTHORIZATION REASONABLY AND WITH GOOD FAITH RELY ON THE AUTHORIZATION?

I agree that Major Harrison was "neutral and detached" within the meaning of *United States v. Ezell,* 6 MJ 307, 315, 320 (CMA 1979), and that he had a substantial basis for his probable-cause determination. Assuming that the requisite probable cause did not in fact exist in this case, I would uphold the search on the basis of "the good-faith exception to the exclusionary rule." *See United States v. Morris,* 28 MJ 8, 19 (CMA 1989) (Sullivan, J., concurring in part and in the result). I write only to disassociate myself from certain implications which might be drawn from Judge Crawford's opinion.

Two principles of law are suggested in her opinion which I cannot accept. The first proposition, albeit implied, is that the "good-faith exception" to the exclusionary rule as applied at courts-martial only requires that the commander issuing the search authorization be "impartial" rather than "neutral and detached." *See* Mil. R.Evid. 315(d), Manual for Courts–Martial, United States, 1984. The second is that the lesser Manual standard of "impartiality" is adequate to resolve the accused's constitutional objection to evidence seized pursuant to an invalid search authorization.

Mil.R.Evid. 311(b)(3) states:

(3) Evidence that was obtained as a result of an unlawful search or seizure may be used if:

(A) The search or seizure resulted from an authorization to search, seize or apprehend issued by an *individual competent to issue the authorization under Mil.R.Evid. 315(d)* or from a search warrant or arrest warrant issued by competent civilian authority;

(B) The individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause; and

(C) The officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant. Good faith shall be determined on an objective standard.

(Emphasis added.) Mil.R.Evid. 315(d) further states:

(d) *Power to authorize.* Authorization to search pursuant to this rule may be granted *by an impartial individual* in the following categories:

(1) *Commander.* A commander or other person serving in a position designated by the Secretary concerned as either a position analogous to an officer in charge or a position of command, who has control over the place where the property or person to be searched is situated or found, or, if that place is not under military control, having control over persons subject to military law or the law of war; or

(2) *Military judge.* A military judge or magistrate if authorized under regulations prescribed by the Secretary of Defense or the Secretary concerned.

An *otherwise impartial authorizing official* does not lose that character merely because he or she is present at the scene of a search or is otherwise readily available to persons who may seek the issuance of a search authorization; *nor does such an official lose impartial character merely because the official previously and impartially authorized investigative activities when such previous authorization is similar in intent or function to a pretrial authorization made by the United States district courts.*

(Emphasis added.)

The Analysis of the Drafters of these Rules of Evidence made it crystal clear that this language was intended to incorporate the "neutral and detached" standard of *United States v. Ezell, supra.* They said:

Rule 311(b)(3) was added in 1986 to incorporate the "good faith" exception to the exclusionary rule based on *United*

*States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed. 2d 677 (1984) and *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed. 2d 737 (1984). The exception applies to search warrants and authorizations to search or seize issued by competent civilian authority, military judges, military magistrates, and commanders. The test for determining whether the applicant acted in good faith is whether a reasonably well-trained law enforcement officer would have known the search or seizure was illegal despite the authorization. In *Leon* and *Sheppard,* the applicant's good faith was enhanced by their prior consultation with attorneys.

*The rationale articulated in Leon and Sheppard that the deterrence basis of the exclusionary rule does not apply to magistrates extends with equal force to search or seizure authorizations issued by commanders who are neutral and detached, as defined in United States v. Ezell,* 6 MJ 307 (CMA 1979). The United States Court of Military Appeals demonstrated in *United States v. Stuckey,* 10 MJ 347 (CMA 1981) that commanders cannot be equated constitutionally to magistrates. *As a result, commanders' authorizations may be closely scrutinized for evidence of neutrality in deciding whether this exception will apply.* In a particular case, evidence that the commander received the advice of a judge advocate prior to authorizing the search or seizure may be an important consideration. Other considerations may include those enumerated in *Ezell* and: the level of command of the authorizing commander; whether the commander had training in the rules relating to search and seizure; whether the rule governing the search or seizure being litigated was clear; whether the evidence supporting the authorization was given under oath; whether the authorization was reduced to writing; and whether the defect in the authorization was one of form or substance.

Manual, *supra* at A22–17 (Change 2) (emphasis added).

Assuming I have misconstrued these Manual rules and their impartiality requirement, I must address the more substantial constitutional question alluded to in Judge Crawford's opinion. I reject the suggestion or even the unintended implication of the opinion that Manual rules provide the exclusive protection to servicemembers from unreasonable searches and seizures. Consequently, I could not find the purportedly less demanding Manual rules dispositive of the accused's Fourth Amendment claims. Instead, it is only where these Manual rules fully satisfy the demands of the Constitution and the Bill of Rights as applied in the military context that resolution of the accused's claims on this basis would be appropriate. *See United States v. Morris, supra* at 19.

In this regard general reference to the plurality opinion of the Supreme Court in *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), is warranted. Moreover, the remand order of the Supreme Court in *Goodson v. United States,* 471 U.S. 1063, 105 S.Ct. 2129, 85 L.Ed.2d 493, states:

April 29, 1985. On petition for writ of certiorari to the United States Court of Military Appeals. The petition for writ of certiorari is granted. The judgment is vacated and the case is remanded to the United States Court of Military Appeals for further consideration in light of *Smith v. Illinois,* 469 U.S. 91[, 105 S.Ct. 490, 83 L.Ed.2d 488] (1984).

Furthermore, the remand order of the Supreme Court in *Jordan v. United States,* —— U.S. ——, 111 S.Ct. 575, 112 L.Ed.2d 580 (1990), provides:

Dec. 10, 1990. On petition for writ of certiorari to the United States Court of Military Appeals. The petition for writ of certiorari is granted. The judgment is vacated and the case is remanded to the United States Court of Military Appeals for further consideration in light of *Minnick v. Mississippi,* 498 U.S. [146], 111 S.Ct. 486, [112] L.Ed.2d [489] (1990).

The Supreme Court's express direction to consider those cases on the basis of its decisions applying the Bill of Rights contradicts the implication of Judge Crawford's opinion that these most precious and fundamental rights might not at all be available to the American servicemembers.

WISS, Judge (concurring in the result):

I write separately to set forth my view on several aspects of the lead opinion and my basis for concurring with the majority's disposition of this appeal.

## I

I offer no view as to whether Major Harrison had probable cause when he authorized the search here in question. Both the military judge and the Court of Military Review concluded that Harrison did *not* have probable cause. 32 MJ 924, 927 (1991). I view that conclusion in the accused's favor as the law of the case, *see United States v. Ravenel*, 26 MJ 344, 350 n. 5 (CMA 1988), and, thus, will not reevaluate it here. Accordingly, I do not associate myself with Part II of the lead opinion.

## II

Whatever seeming relevance there once might have been to a discussion that might impliedly question application of the Bill of Rights to the military is tardy. As then-Chief Judge Everett observed over a decade ago:

> The time is long past when scholars disputed the applicability of the Bill of Rights to service personnel. Instead, our premise must be "that the Bill of Rights applies with full force to men and women in the military service unless any given protection is, expressly or by necessary implication, inapplicable" and, therefore, that the Fourth Amendment does shield the serviceperson. *United States v. Middleton*, 10 MJ 123, 126 (CMA 1981) (footnote omitted); *United States v. Ezell*, [6 MJ 307] at 313 [ (CMA 1979) ]; *United States v. Hartsook*, 15 USCMA 291, 35 CMR 263 (1965).

*United States v. Stuckey*, 10 MJ 347, 349 (CMA 1981) (footnote omitted).

Understandably, then, I am troubled by the quotation in footnote 2 of the principal opinion. Specifically, I am unsure what suggests to the authors of that quotation that, "[s]trangely enough, in one sense the question remains open." First, as just indicated and as the lead opinion acknowledges in its continuation of that footnote, *this Court* quite clearly has applied the pertinent portions of the Bill of Rights. *See United States v. Jacoby*, 11 USCMA 428, 430–31, 29 CMR 244, 246–47 (1960), citing *Burns v. Wilson*, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953). Unless and until the Supreme Court of the United States hold otherwise, the law of this Court *closes* this question. Second, as the separate opinion of the Chief Judge demonstrates, the *Supreme Court* has applied pertinent portions of the Bill of Rights to the military. In doing so, nothing in the actions of the Supreme Court cited by the Chief Judge indicates that the Court has *assumed application of constitutional provisions without so deciding;* thus, I must reject the implication that this *assumed* application of the Bill of Rights has somehow left the question open.

Thus, I am unsure what is the purpose of footnote 2. If, though, it is to suggest any uncertainty on this question, I disagree.

## III

The principal opinion equates the requirement that a military *commander* must be neutral and detached when issuing a search authorization, on the one hand, with the neutrality and detachment of a *magistrate* determining probable cause, on the other. From this, that opinion concludes that a military commander's search authorization *necessarily* serves as an equally sound basis for applying the good-faith exception as does a magistrate's warrant. I believe that this logical leap is flawed.

## A

In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the

Supreme Court of the United States "modified somewhat" the exclusionary rule that seeks to enforce the Fourth Amendment's protection against unreasonable searches and seizures. *Id.* at 905, 104 S.Ct. at 3411. The Court went on to conclude that, where law enforcement officers seize evidence in reasonable good-faith reliance on a search "warrant issued by a detached and neutral magistrate," that evidence is admissible on the merits in a subsequent criminal trial. *Id.* at 913, 104 S.Ct. at 3415. As the majority opinion of the court below recognized:

> The underlying premise of *Leon* is that the exclusionary rule is designed to deter police misconduct, and that purpose is not advanced when the police act in good faith reliance on a judicial officer's determination of probable cause.

32 MJ 924, 928 (1991). Thus, it is clear that the good-faith exception of *Leon* has two points of focus: First, the existence of a search warrant that was issued by a "detached and neutral magistrate"; and second, the reasonable good-faith reliance on that warrant by the executing officers.

Application of this exception in military practice is not difficult conceptually where the search is pursuant to a military magistrate's warrant. The difficulty has come in attempted application of the exception, in light of its rationale, to search authorizations given by military commanders. Mil. R.Evid. 311(b)(3), Manual for Courts–Martial, United States, 1984, reflects confusion as to the appropriate analysis,* and the principal opinion in this case, if anything, contributes to it.

It is helpful to a clearer analysis of the exception if each of the two points of the Supreme Court's focus in *Leon* is considered in the context of military justice.

*Warrant by a "detached and neutral magistrate"*

The *Leon* majority reviewed its "strong preference for warrants" and the concomitant " 'great deference' [that should be given] to a magistrate's determination." 468 U.S. at 914, 104 S.Ct. at 3416. In considering the deterrence basis for the exclusionary rule as applied to a magistrate's warrant, the Court noted:

> To the extent that proponents of exclusion rely on its behavioral effects on judges and magistrates in these areas, their reliance is misplaced. First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion.
>
> Third, and most important, we discern no basis and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate.... [T]o the extent that the rule is thought to operate as a "systemic" deterrent on a wider audience, it clearly can have no such effect on individuals empowered to issue search warrants. Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them. Imposition of the exclusionary sanction is not necessary meaningfully to inform judicial officers of their errors, and we cannot conclude that admitting evidence obtained pursuant to a warrant while at the same time

---

* For instance, Mil.R.Evid. 311(b)(3)(B) requires that, as part of the good-faith exception, it must be found that "[t]he individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause." I can find no basis at all for this in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Moreover, under

the majority opinion in *United States v. Figueroa*, 35 MJ 54 (CMA 1992), which I do not fully join, once it can be found on review that the authorizing official had a substantial basis for the belief that probable cause existed, then the finding of probable cause is *affirmed*, and usually the good-faith reliance on that finding would not then be in issue.

declaring that the warrant was somehow defective will in any way reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests.

*Id.* at 916–17, 104 S.Ct. at 3417 (footnotes omitted).

In my view, these observations concerning the lack of connection between deterrence through exclusion do not necessarily apply as persuasively to command search authorizations as to magistrates' warrants. A neutral and detached military commander may authorize a search, *not* because the commander and the authorization are equivalent to a magistrate and a warrant, but "because it complies with the Fourth Amendment's basic norm of reasonableness ... in light of his responsibilities and the expectations of the persons who will be affected by the searches and seizures." *United States v. Stuckey*, 10 MJ at 361 (footnote omitted). Simply because a particular commander may be "detached and neutral" enough to conclude that a search pursuant to his or her authorization based on probable cause was "reasonable" under the Fourth Amendment does not ineluctably lead to a conclusion that that commander's authorization is entitled to the "great deference" of a magistrate's warrant if later that authorization is found not to have been based on probable cause.

For instance, it is not abundantly clear to me that—in contradistinction to judges and magistrates—there is no basis to believe that exclusion of evidence seized pursuant to a command authorization will not have a significant deterrent effect on certain commanders. Stated another way, and to paraphrase the Supreme Court's discussion quoted above, I do not believe that it is at all clearcut that the exclusionary rule "can have no such [deterrent] effect on individuals empowered to" authorize searches when those individuals are commanders.

Further, and again paraphrasing from the Supreme Court's observations related to deterrence, commanders may not literally be "adjuncts to the law enforcement team," but it is not entirely fair to conclude that "they have no stake in the outcome of particular criminal prosecutions." It may well be, as the Supreme Court determined, that admitting evidence seized pursuant to a defective warrant will not "in any way *reduce judicial officers' professional incentives* to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests." 468 U.S. at 917, 104 S.Ct. at 3417 (emphasis added). But it is naive to conclude, in my opinion, that admitting evidence seized pursuant to a defective command authorization will not do so.

The untempered reality is that *military officers' professional incentives* when faced with requests for search authorizations are much more complex than are those of *judicial officers.* Unlike magistrates—civilian or military—"[a] military commander has responsibilities for investigation and for law enforcement that a magistrate does not possess. Also, he has responsibilities for the welfare and combat readiness of the personnel under his command." *United States v. Stuckey, supra* at 359. *Accord United States v. Morris,* 28 MJ 8, 12 (CMA 1989) (Everett, C.J.); *United States v. Queen,* 26 MJ 136, 141–42 (CMA 1988) (Everett, C.J.). Thus, I do not *criticize* commanders who have mixed emotions when search authorizations are requested; rather, I merely recognize that their incentives are not so clear and simple as those of judicial officials—simply because their responsibilities are more complex.

This should not be read to infer that I believe that *all* commanders *qua* commanders do not meet the Supreme Court's expectations of the detached and neutral judicial officers whose probable-cause determinations are entitled to be executed in reasonable good faith. Necessarily, this judgment must be ad hoc because, just like the facts underlying the probable-cause decision itself, the circumstances vary from case to case. In other words, a commander's authorization is not ineligible *per se* from serving as the basis for application of

a good-faith exception; neither, however, is it as fully and automatically entitled to the deference in that regard as a warrant from a magistrate, civilian or military, would be.

As the proponent of the evidence, it is trial counsel's responsibility, in the face of a proper defense objection to the evidence, not only to show existence of probable cause if that is the Government's primary basis of admissibility but also, alternatively, to demonstrate an adequate factual basis upon which the military judge and appellate courts may conclude that the particular commander in that case is the sort of official that the Supreme Court in *Leon* had in mind—one who is akin to a "judicial officer[ ]" with "no stake in the outcome of particular criminal prosecutions." *United States v. Leon*, 468 U.S. at 917, 104 S.Ct. at 3417. It is only *this* sort of commander who, in practical reality, will not be deterred by the exclusionary rule; thus, it is only *this* sort of commander whose authorizations are entitled to be relied upon in reasonable good faith. *See id.* at 927–28, 104 S.Ct. at 3422–23 (Blackmun, J., concurring).

### Reasonable good-faith reliance

Given a commander whose authorization is entitled to the "great deference" to which a magistrate's warrant is entitled, evidence yielded by "objectively reasonable" enforcement of that commander's subsequently invalidated search authorization will not be suppressed. *See id.* at 919, 104 S.Ct. at 3418. As the Supreme Court acknowledged, this "assumes, of course, that the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant. *Cf. Massachusetts v. Sheppard*, [468 U.S. 981, 989, n. 6, 104 S.Ct. 3424, 3428 n. 6, 82 L.Ed.2d 737] ..." 468 U.S. at 918 n. 19, 104 S.Ct. at 3418 n. 19.

Adding flesh to the "objectively reasonable" enforcement of an authorization, the Supreme Court had this to say in *Leon:*
    ... "[A] warrant issued by a magistrate normally suffices to establish" that a law

enforcement officer has "acted in good faith in conducting the search." *United States v. Ross*, 456 U.S. 798, 823, n. 32, 102 S.Ct. 2157, 2172, n. 32, 72 L.Ed.2d 572 (1982). Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, *cf. Harlow v. Fitzgerald*, 457 U.S. 800, 815–819, 102 S.Ct. 2727, 2736–2738, 73 L.Ed.2d 396 (1982), and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.

Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown v. Illinois*, 422 U.S., [590] at 610–611, 95 S.Ct. [2254] at 2265 [45 L.Ed.2d 416] [ (1975) ] (POWELL, J., concurring in part); *see Illinois v. Gates, supra*, [462 U.S. 213] at 263–264, 103 S.Ct. at 2345–2346 [ (1983) ] (WHITE, J., concurring in judgment). Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient— *i.e.*, in failing to particularize the place to be searched or the things to be seized— that the executing officers cannot reasonably presume it to be valid. *Cf. Massachusetts v. Sheppard*, [468 U.S. 981],

at 988–991, 104 S.Ct. 3424, at 3427–3429 [ (1984) ].

468 U.S. at 922–23, 104 S.Ct. at 3420 (footnotes omitted).

## B

Applying these principles, I agree with the majority that the good-faith exception applies in this case. The record reflects that Major Harrison met the Supreme Court's vision of "a detached and neutral ... judicial officer" whose probable-cause determinations are entitled to "great deference." In the absence of any evidence to the contrary, I will not suppose otherwise.

I pause, however, to reiterate the principal opinion's acknowledgement of Major Harrison's apparent relative lack of familiarity with the notion of probable cause. 35 MJ at 42. Under some circumstances, where an authorizing official has such an infirm basis to make his judgment, that official might well fall short of one whose judgments are entitled to "great deference." Major Harrison, however, sought the opinion of the staff judge advocate as to the sufficiency of this information to support probable cause, and the staff judge advocate advised him that it met that standard. While not a prototype and while the military ought to ensure that anyone to whom it gives the authority to order searches is appropriately trained to perform that mission, just like any other mission, I am satisfied that any deficiency as to Major Harrison's ability to perform as a "judicial officer" was thus remedied.

Candidly, I have some pause in this case as to the reasonable good-faith reliance of the law enforcement officers on that authorization. Sergeant McKinnon, who made the request of Major Harrison, did not give Harrison all the information that he had—that is, that the cashiers' information was given 5 weeks earlier. He also did not tell Harrison anything about the cashiers themselves upon which Harrison might judge the quality of their information. However, I see no indication in the record that these omissions were a conscious effort to affect Harrison's evaluation of probable cause, so I conclude that they do not show an absence of objective good faith of the executing officials. Moreover, I see no indication of any other reason to believe that the law enforcement officers did not act with objective reasonableness in relying on and in carrying out the authorization.