# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM 39296 (rem)

————————————

### UNITED STATES
*Appellee*

**v.**

### Richard D. COLLINS
Master Sergeant (E-7), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 6 May 2022[1]

————————————

*Military Judge:* Tiffany M. Wagner.

*Approved sentence:* Dishonorable discharge, confinement for 198 months, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 26 February 2017 by GCM convened at Eglin Air Force Base, Florida.

*For Appellant:* William E. Cassara, Esquire (argued); Major Mark J. Schwartz, USAF; Major Dustin J. Weisman, USAF.

*For Appellee:* Major Michael T. Bunnell, USAF (argued); Lieutenant Colonel Joseph J. Kubler, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge POSCH and Senior Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

[1] We heard oral argument in this case on 28 June 2018, prior to the issuance of this court's original opinion.

_____

JOHNSON, Chief Judge:

Appellant's case is before us for the second time. A general court-martial composed of officer and enlisted members found Appellant guilty, contrary to his pleas, of one specification of rape in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[2] The court-martial sentenced Appellant to a dishonorable discharge, confinement for 198 months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence.

On appeal, Appellant initially raised seven issues: (1) whether the statute of limitations had run on the alleged offense of rape; (2) whether the evidence was factually insufficient to support the conviction; (3) whether Appellant was denied effective assistance of counsel guaranteed by the Sixth Amendment[3] where his trial defense counsel failed to present evidence of an alternative suspect; (4) whether Appellant was subjected to unreasonable search and seizure in violation of the Fourth Amendment;[4] (5) whether Appellant was denied his Sixth Amendment right to confrontation where the military judge permitted a prosecution witness to testify by remote means; (6) whether Appellant's Fifth Amendment[5] due process rights were violated by the loss of exculpatory evidence in the 15 years between the alleged offense and the court-martial; and (7) whether the convening authority committed unlawful command influence.[6] Applying our superior court's holding in *United States v. Mangahas*, 77 M.J. 220, 225 (C.A.A.F. 2018), *overruled by United States v. Briggs*, 141 S. Ct. 467, 474 (2020), we ruled in Appellant's favor with respect to issue (1) and set aside the findings of guilty and sentence, and dismissed the Charge and its Specification, without addressing the other raised issues. *United States v. Collins*, 78 M.J. 530, 537 (A.F. Ct. Crim. App. 2018), *rev'd*, 81 M.J. 63 (C.A.A.F. 2021).

The Judge Advocate General certified three issues for review by the United States Court of Appeals for the Armed Forces (CAAF), which, in light of its

_____

[2] All references to Article 120, UCMJ, are to the *Manual for Courts-Martial, United States* (2000 ed.). Unless otherwise noted, all other references to the UCMJ, the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] U.S. CONST. amend. VI.

[4] U.S. CONST. amend. IV.

[5] U.S. CONST. amend. V.

[6] Appellant personally asserted issues (6) and (7) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

decision in *United States v. Briggs*, 78 M.J. 289 (C.A.A.F. 2019), *rev'd*, 141 S. Ct. 467 (2020), summarily affirmed this court's decision. *United States v. Collins*, 78 M.J. 415, 415–16 (C.A.A.F. 2019), *rev'd*, 141 S. Ct. 467 (2020).

The Government then filed a petition for writ of certiorari with the United States Supreme Court, which granted the petition, reversed the CAAF's judgment, and remanded Appellant's case for further proceedings. *Briggs*, 141 S. Ct. at 474. On remand to the CAAF, our superior court reversed this court's prior decision and returned Appellant's case to The Judge Advocate General for a new review by this court under Article 66, UCMJ, 10 U.S.C. § 866 (2012).

Upon remand to this court, Appellant reasserts four of the issues he initially raised in his original appeal: (1) whether the evidence is factually sufficient to support his conviction; (2) whether he was denied effective assistance of counsel; (3) whether the military judge erred by failing to suppress evidence the Government obtained through unreasonable search and seizure; and (4) whether the military judge erroneously permitted a prosecution witness to testify by remote means. We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

In August 2000, HA was a member of the Air National Guard stationed at Sheppard Air Force Base (AFB), Texas, where she was attending her initial training as a radiology technician. HA had previously enlisted in the Army in 1999 before transferring to the Air National Guard, and her status as a "prior service" student entitled her to somewhat different treatment and privileges compared to most of her fellow trainees, who had arrived from Air Force basic training and were referred to as "pipeline" students. Among other distinctions, HA lived apart from the pipeline students and was prohibited from socializing with them outside of training; she was entitled to have her own vehicle; and she was able to visit the base's enlisted club during her free time.

On 25 August 2000, HA went to the enlisted club alone to eat dinner. There she noticed a group of four of her instructors sitting together, in uniform, drinking and conversing. She recognized Appellant as one of these instructors. Radiology students were prohibited from socializing with instructors outside of training, and HA did not acknowledge or speak with the instructors. However, as she sat eating alone she could hear bits of their conversation. While HA was still at the club, the instructors got up to leave and HA recalled one of them making a comment about having a pregnant wife. Three of the instructors departed the club, but Appellant walked over to HA's table.

HA believed Appellant was drunk based on his behavior. HA later testified that in class Appellant had a "very stern" demeanor and "was not somebody

who joked around." However, on this occasion Appellant was making jokes and talking about the radiology students' upcoming graduation; in addition, he was slurring his words and smelled like "alcohol." Based on her perception that Appellant was intoxicated, HA suggested that he should take a taxi or shuttle home, but Appellant declined and said he was "fine." HA then offered to drive Appellant home herself; at trial HA testified that her aunt had been killed by a drunk driver and she was "worried about what could happen." Appellant accepted HA's offer.

HA did not know where Appellant lived and followed his directions to get there. During the drive, Appellant was "playing with the locks of [her] car still joking around acting like a kid." At trial, HA remembered that Appellant lived on a curved road close to an on-base school, and that Appellant lived in a section of base housing with a name that started with the letter "W." It was still light outside when they arrived at Appellant's house. HA recalled it was a single-story house with grass and a tree and a walkway to the front door.

HA helped Appellant get out of her car by unbuckling his seat belt and putting his feet on the ground. HA then helped Appellant to the door with his arm draped over her shoulders. As they walked, Appellant was "playing around" and "trying to stick his hand down her T-shirt." In response, HA would slap his hand and told him to "stop it," and "chalked [his behavior] up to him being drunk." HA used Appellant's keys to open the door for him and went inside the house "just a little bit."

According to HA, Appellant's behavior then abruptly changed. He suddenly pushed her against the wall and "held [her] by her chest where [her] throat is." Appellant did not seem drunk any more. Appellant made a comment that he had seen HA "watching" him in class. HA pushed him and tried to move to the door. Appellant then grabbed HA by the shoulder and pulled her down so that she hit her head hard on the floor. HA later described her condition as "kind of knocked out." Her next memory was of Appellant on top of her trying to pull her pants down. HA struggled against Appellant and tried to hit him, but Appellant punched her in the face. Appellant then penetrated HA's vagina with his penis.

While that was occurring, HA focused on a family portrait hanging on the wall of Appellant's living room. The portrait depicted Appellant, Appellant's wife CC, CC's daughter, and Appellant's and CC's infant son who had been born in 1999. HA also felt carpet underneath her, and felt Appellant's white t-shirt which kept hitting her in the face. After Appellant ejaculated, he stood over her and told her if she "said anything that he would flunk [her], and that nobody would believe [her] anyways because [she] was an Airman and he was a Sergeant." Appellant then walked away from her, and HA grabbed her clothes and "ran out." HA drove back to her billeting room and showered, and

saw that she had "blood coming off of [her]." HA did not call anyone or report the offense during that weekend.

On Monday, 28 August 2000, HA went to her radiology classroom with a black eye and scratches on her face and knuckles. After initially claiming that she had fallen, HA reluctantly admitted to a female instructor that she had been sexually assaulted. As a result, HA was transported to a civilian hospital in Wichita Falls, Texas, where she underwent a sexual assault forensic exam (SAFE). KH, the sexual assault nurse examiner (SANE) who examined HA, noted a number of physical injuries including: a black eye; a cut below the eye; tenderness on the back of the head; scratches and cuts on the knuckles; tenderness and a red mark or bruise on one shin; a cut on the inside of the mouth; and a tear, an ulceration, and an abrasion in HA's genital area. Due to the extent of HA's injuries, KH referred HA to the emergency room for treatment once her exam was complete. The Air Force Office of Special Investigations (AFOSI) and civilian police initiated investigations based on HA's reported sexual assault. HA did not want to identify Appellant as her assailant, and she falsely stated that she had been assaulted in an off-base store parking lot by an unknown male who had digitally penetrated her vagina.

HA graduated from her initial radiology course at Sheppard AFB in early September 2000 while the AFOSI investigation continued. HA then went to Wright-Patterson AFB, Ohio, for the next phase of her training. After security camera video from the store HA had identified failed to corroborate her statements, AFOSI agents obtained permission from their chain of command to conduct a "confrontational" interview with her at Wright-Patterson AFB. When confronted, HA became distraught and repeatedly asked to leave the interview, but eventually admitted her prior account of the sexual assault was not true. HA told the agents she made it up because she did not want to identify the attacker, but she had been pressured at the hospital to say what had happened. HA admitted she knew who the assailant was, but she said she did not want to "ruin a family." She denied the assailant had been one of her course instructors. Because HA refused to identify the perpetrator, AFOSI and the civilian police eventually ended their investigations. Civilian authorities retained control of the evidence collected during the SAFE and destroyed its biological evidence in 2002.

HA separated from the Air National Guard in 2003. In 2006 HA rejoined the military as a member of the Air Force reserve. Also in 2006, HA suffered a traumatic brain injury (TBI) to the frontal lobe of her brain while skydiving. According to expert testimony introduced at trial, this injury resulted in some impairment of "the speed and fluidity with which [HA] was able to respond to" questions and to her short-term memory, but there was no evidence of impairment to her long-term memory.

HA entered active duty with the Air Force in 2009. In April 2011, HA made a restricted sexual assault report to Dr. AF, an Air Force mental health provider at Malmstrom AFB, Montana, stating that between 2000 and 2003 she had been physically and sexually assaulted by an instructor, but she "did not want to be involved." Dr. AF referred HA to a Sexual Assault Response Coordinator (SARC), to whom HA made a restricted report that she had been sexually assaulted by an active duty Air Force member at Sheppard AFB, but HA did not identify the assailant. These restricted reports were not referred to law enforcement or investigated.

HA separated from the Air Force again in 2011. After her separation, HA received disability payments and medical benefits through the Department of Veterans Affairs (VA), to include counseling. However, after she moved to Florida, HA was not eligible to receive VA counseling in the local area where she lived and had to drive over three hours to an eligible VA facility for counseling—including counseling related to sexual assault. HA attempted to modify her benefits to include insurance that would permit her to obtain counseling in the local area where she lived. However, the Air Force Board for Correction of Military Records (BCMR) denied her request for the reason, as HA understood it, that "there was no proof that a rape ever happened" to her. As a result, HA obtained records from her treatment in the emergency room in 2000. However, she was concerned about submitting these records because she still did not want to report a crime. As a result of this concern, HA called the legal office at Sheppard AFB in March 2014 and spoke with the Chief of Military Justice, Captain (Capt) LW.[7] HA asked Capt LW for advice concerning the ramifications of reporting a rape to the BCMR. In the course of their conversation, HA identified Appellant as the perpetrator of the rape, and identified him as one of her instructors. Capt LW explained to HA that their conversation constituted an unrestricted report of sexual assault, and Capt LW then notified the AFOSI detachment at Sheppard AFB of HA's report.

The AFOSI reinitiated their investigation; this time HA cooperated and consistently identified Appellant as the perpetrator. Based on HA's description of the offense and the family portrait she saw on Appellant's wall in August 2000, the AFOSI obtained a search authorization for the then-current residence of Appellant, who at that point was stationed at Eglin AFB, Florida. AFOSI agents executed the search and obtained three photographs of Appellant with his family while he had been stationed at Sheppard AFB. One of these photographs was a family portrait that closely matched the description provided by HA. When shown the photographs obtained from the search, HA

---

[7] LW separated from the Air Force before Appellant's trial.

identified the portrait subsequently admitted at trial as Prosecution Exhibit 3 as the one she had seen on Appellant's wall.

Appellant was charged with one specification of rape in violation of Article 120, UCMJ. After the Government presented its case-in-chief, including, *inter alia*, the testimony of HA and numerous other witness, photographs of HA's injuries in 2000, and Prosecution Exhibit 3, the Defense presented its case which included, *inter alia*, the testimony of Appellant and his wife, CC. Appellant denied committing the offense or that HA had ever been to his residence on Sheppard AFB. Moreover, Appellant and CC repeatedly and unequivocally denied that Prosecution Exhibit 3 had ever been hung on the wall of their house on Sheppard AFB. However, the Government contradicted this testimony with a photograph of Appellant's family sitting on the sofa in their living room on Sheppard AFB; the bottom edge of Prosecution Exhibit 3 is visible and identifiable at the top of the photograph, hanging on the wall behind the sofa.

The court members found Appellant guilty of the Charge and Specification.

## II. DISCUSSION

### A. Factual Sufficiency

#### 1. Law

We review issues of factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, 2022 CAAF LEXIS 278 (C.A.A.F. 12 Apr. 2022).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Id*. at 525 (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2018) (citation omitted). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

Appellant's conviction for rape required the Government to prove: (1) that at or near Sheppard AFB, Texas, on or about 25 August 2000, Appellant committed an act of sexual intercourse on HA; and (2) that Appellant committed the act of sexual intercourse by force and without consent. *See Manual for Courts-Martial, United States* (2000 ed.), pt. IV, ¶ 45.b.(1).

**2. Analysis**

### *a. The Government's Case*

The Government introduced convincing evidence of Appellant's guilt. Most significantly, HA's testimony described how Appellant committed an act of sexual intercourse upon her by penetrating her vagina with his penis, by force and without her consent, in his residence on Sheppard AFB on 25 August 2000. At trial, HA was unequivocal in identifying Appellant as the perpetrator. HA admitted that her initial claim of being sexually assaulted by a stranger was fabricated, but the Government mitigated the impact of these false statements on HA's credibility through her testimony and that of other witnesses. The Government was able to convey that in 2000, HA only reluctantly reported being sexually assaulted at all, and made the false report due to a combination of feeling pressured by law enforcement, being afraid of what Appellant might do, and not wanting to harm Appellant's family. The Government also introduced evidence that support for victims of sexual assault in the form of restricted reporting, SARCs, victim advocates, and special victims' counsel did not exist in the Air Force in 2000. The Government was also able to explain through the testimony of Dr. SZ, an expert in clinical psychology and neuropsychology, that there was no evidence the TBI HA suffered in 2006 would have affected her memory of events in August 2000.

The Government powerfully reinforced HA's testimony with the testimony of KH, the SANE who examined HA on 28 August 2000, and with photographs depicting HA's injuries. These injuries significantly corroborated HA's testimony that she had been physically subdued and sexually penetrated without her consent. Notably, KH testified that of an estimated 200 SAFEs she performed as a SANE, HA was the only patient she had seen with injuries significant enough to warrant sending her to an emergency room after the exam.

In addition, HA's testimony in conjunction with other evidence indicated she accurately recalled certain details from the events of 25 August 2000. For example, HA recalled one of the instructors at the club indicated his wife was pregnant; testimony established that, in fact, one of the instructors did have a pregnant wife at that time. HA correctly remembered that Appellant's house

8

was in a section of housing the name of which began with a "W,"[8] on a curved road, close to a school. Most significantly, she recalled and described for investigators the family portrait, Prosecution Exhibit 3, hanging on the living room wall above Appellant's sofa, a memory corroborated by another, later photograph taken in Appellant's residence. There is little credible explanation for HA's knowledge of the portrait and its location in Appellant's house other than that HA had been there, as she testified.

Furthermore, the Government was able to demonstrate both Appellant and CC testified falsely under oath that Prosecution Exhibit 3 had never hung on the wall of their house at Sheppard AFB. The Government thereby specifically demonstrated their unreliability as witnesses and, in addition, provided evidence of Appellant's consciousness of guilt.

### b. Defense Arguments

Appellant raises a number of arguments as to why we should not be convinced of his guilt beyond a reasonable doubt. We address the most significant of them below.

Appellant contends his testimony denying he committed the offense is, standing alone, sufficient to create reasonable doubt. We disagree. Beyond his obvious bias as a witness, his credibility was severely damaged by his demonstrably false testimony regarding a critical piece of evidence—his adamant assertion that Prosecution Exhibit 3 was never placed on the wall of his living room.

Appellant notes that HA lied to medical providers and law enforcement when she initially provided a detailed description of the sexual assault in August 2000. This is a fair point. However, as described above, at trial the Government introduced evidence to persuasively explain why HA felt pressured to provide some explanation but did not want to reveal the truth at that point in time. The Government also introduced evidence of subsequent pretrial statements HA made that were consistent with her trial testimony. This included the testimony of Dr. AF, the former Air Force psychologist to whom HA made a restricted report in 2011 that she had been physically and sexually assaulted by an instructor; the testimony of the SARC to whom HA also made a restricted report in 2011 that she had been raped at Sheppard AFB by an active duty Air Force member; a stipulation of expected testimony from LW (formerly Capt LW) that HA told her in 2014 that Appellant had raped her in 2000; and evidence HA identified Appellant as the perpetrator to AFOSI in 2015.

---

[8] This housing area was demolished a few years later and no longer existed when HA made her restricted reports in 2011 and the unrestricted report in 2014.

Appellant contends the TBI HA suffered in 2006 likely affected the accuracy of her memories of 2000. After carefully reviewing the testimony of both Dr. SZ, the Government's expert witness in clinical psychology and neuropsychology, and Dr. MZ, the psychologist called by the Defense, we find the evidence does not substantially support Appellant's argument. There was little evidence that HA's injury would have impaired her memory of events from 2000. Moreover, Dr. MZ's own testimony suggested that individuals are more likely to retain accurate long-term memories of information they perceive to be important at the time they sense it—experiencing a violent physical and sexual assault inflicted by one's military superior would seem to meet that criteria.

Appellant points to evidence that HA provided the AFOSI with apparently inaccurate information from her memory of Appellant's residence that conflicts with other evidence. For example, HA inaccurately described Appellant's residence as having a driveway and garage, and remembered a window being in a different place. However, in contrast to the physical and sexual assault Appellant inflicted on HA, these details were not the focus of HA's attention as she tried to get Appellant to his front door. Any discrepancies in HA's memory in this regard pale in comparison with HA's detailed description of the violent assault, her knowledge of the portrait on Appellant's wall, and other evidence of Appellant's guilt.

Appellant contends HA had a motive to fabricate a claim of sexual assault perpetrated by Appellant in order to obtain a medical military retirement. He notes that although HA testified she had a 100 percent disability rating and medical benefits from the VA, she was not entitled to receive counseling in her local area through military-sponsored insurance after she moved to Florida. After the BCMR denied her effort to change this, it appeared that she would need to substantiate her claim of having been raped in 2000. However, from the date of the offense through her conversation in 2014 seeking advice from then-Capt LW, HA consistently indicated she did not desire to initiate an investigation or prosecution of Appellant. In 2011, while she was still on active duty at Malmstrom AFB, she provided restricted reports to the effect that she had been raped by an instructor at Sheppard AFB. In light of the totality of the evidence, we find Appellant's argument unpersuasive.

### c. Conclusion with Regard to Factual Sufficiency

Having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

10

**B. Ineffective Assistance of Counsel**

**1. Additional Background**[9]

During the AFOSI investigation following HA's unrestricted report in 2014, agents explored the possibility that HA had misidentified Appellant and that the actual perpetrator was DB, another of HA's radiology instructors at Sheppard AFB. Agents interviewed DB's ex-wife, MC, to whom he was married in August 2000. At that time DB and MC lived together with their two children on Sheppard AFB in a different area of base housing from Appellant. MC informed the AFOSI she remembered returning home from a trip in late summer or early fall of 2000 and finding unexplained scuff marks on the floor, damage to rubber stripping on the interior stairs, and that DB was unexpectedly mopping the floors. MC also described finding an unexplained hole in an interior wall of the house. However, DB denied committing the offense, and HA specifically denied DB was the perpetrator.

Nevertheless, Appellant's trial defense counsel, Mr. PC and then-Capt JA, thought MC's information was potentially useful to suggest DB as an alternative suspect. The Government agreed to produce MC for Appellant's trial at the Defense's request. However, in pretrial interviews with both the Government and Defense, MC stated she had been mistaken about the year in which the events she described to AFOSI had taken place. She now believed they occurred in 2001 rather than 2000. Although trial defense counsel considered MC's changing memory might affect the credibility of her testimony, they still considered potentially calling MC as a witness.

Trial defense counsel's assessment of the utility of MC's testimony diminished over the course of the trial. After HA firmly identified Appellant as the perpetrator, and after Appellant and his wife CC were both effectively impeached by trial counsel, Mr. PC and Capt JA were concerned calling MC might appear to be a desperate tactic the Government could exploit to Appellant's disadvantage. In the middle of the Defense's case, MC informed trial defense counsel that after speaking with her mother again she now believed the events she described to AFOSI *had* occurred in 2000 after all. Even with this information, trial defense counsel elected not to call MC as a witness.

**2. Law**

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard in *Strickland v.*

---

[9] The following background is based in part on sworn declarations provided by Appellant's trial defense counsel, Mr. PC and then-Capt JA, in March 2018 pursuant to an order from this court.

*Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result? *Id*. (alterations in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id*. (quoting *Strickland*, 466 U.S. at 689). With respect to prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome" of the trial. *Id*. (quoting *Strickland*, 466 U.S. at 694).

### 3. Analysis

Appellant contends trial defense counsel were ineffective for failing to call MC to testify and provide evidence DB was a possible alternative suspect. In addition to the suspicious changes in her home that MC (sometimes) recalled had occurred in August or September 2000, Appellant contends HA's descriptions of Appellant's residence in some ways resembled DB's home more than Appellant's. In addition, HA's description of the fictional individual she initially claimed assaulted her in a parking lot—a dark-haired man, possibly of Hispanic or Italian descent, of medium build—was somewhat similar to DB, who was of Hispanic descent. In addition, AFOSI obtained evidence that DB had some history of inappropriate although consensual relationships with students, and MC alleged DB had been abusive toward her.

However, we are not persuaded trial defense counsel's performance fell measurably below the expected level of performance. Mr. PC and Capt JA provide several reasonable explanations for their tactical decision not to call MC. Among other considerations, MC's changing memory regarding the relevant dates, of which the Government was well aware, impaired her credibility. HA definitely identified Appellant as the perpetrator and specifically denied it was

DB. HA's description of the family portrait was similar to, and she specifically identified it as, the family portrait found in Appellant's house. HA's description of the family matched Appellant's family but did not match the family of DB and MC, who had two sons rather than a girl and an infant boy. Moreover, MC indicated she and DB did not even own a family portrait similar to the one HA described. HA's description of driving to Appellant's residence matched the route she would have taken to Appellant's house, but not how she would have driven to DB's residence. In short, there was compelling evidence incriminating Appellant and little to no evidence incriminating DB. Trial defense counsel could reasonably conclude advancing such an unsubstantiated proposition might cause net harm to the Defense's case in the eyes of the court members; they might reasonably seek instead to create doubt as to the reliability of HA's memory and testimony regarding long-ago events she previously lied about.

For similar reasons, Appellant fails to demonstrate a reasonable probability of a different result. As described above, the Government introduced convincing evidence of Appellant's guilt. In contrast, there was no substantial evidence tying DB to the offense. MC may have been understandably suspicious and resentful of her estranged ex-husband DB; however, she could provide no evidence that DB was responsible for HA's injuries.

Accordingly, we find Appellant cannot meet his burden to demonstrate he is entitled to relief for ineffective assistance of counsel.

## C. Motion to Suppress

### 1. Additional Background

On 20 April 2015, AFOSI Special Agent (SA) JD signed a sworn affidavit, based largely on information provided by HA, in support of an application for authorization to search Appellant's residence on Eglin AFB for the family portrait HA saw during the offense in August 2000, which ultimately became Prosecution Exhibit 3. Among other information, SA JD's affidavit stated HA indicated the assault took place on an unspecified date in August 2000. HA described the picture as a professional portrait of Appellant's family including Appellant, an adult female, a male child, and a female child with long hair. SA JD attached to her affidavit a stick-figure sketch HA had drawn depicting her memory of the relative positions and proportions of the figures in the portrait. SA JD's affidavit concluded:

> In consideration of the foregoing, I believe there is probable cause that [Appellant] still possesses the family photo described by [HA]. [Appellant] has been married to his spouse for 17 years, and based on my investigative experience and training, a person is likely to keep a professional family photo amongst their personal belongings, or displayed in their home. . . .

The same day, 20 April 2015, the military magistrate issued a written authorization to search Appellant's residence and seize the photo described in the affidavit. AFOSI agents executed the search and seized three family photos from Appellant's house, including Prosecution Exhibit 3. These photos were subsequently shown to HA who identified Prosecution Exhibit 3 as the portrait she had seen on Appellant's living room wall in August 2000.

Before trial, the Defense moved to suppress Prosecution Exhibit 3 and evidence about it on the grounds that, *inter alia*,[10] the information contained in the affidavit was stale after the passing of more than 14 years, and therefore probable cause for the search authorization was lacking. The Government opposed the motion, contending that "[s]taleness is not judged simply by time, but also by the nature of the item sought," and that "professional family portraits – particularly those that include young children – are not the type of item typically discarded by a married couple." The Government further contended that, assuming probable cause was lacking, the military judge should still deny the motion because the AFOSI reasonably relied on the search authorization in good faith, and because suppression of the evidence would not result in appreciable deterrence of future unlawful searches and the benefits of such deterrence would not outweigh the costs to the justice system.

After conducting a hearing, the military judge denied the motion to suppress in an oral ruling she supplemented in writing. Among other considerations, she noted HA had "fixated" on the portrait during the rape; HA was able to describe the individuals depicted in it, including number, age (adult or child), sex, and skin color, and to sketch a crude drawing of it. The military judge further noted there was no evidence HA's TBI in 2006 had resulted in any loss of memory from 2000, and despite discrepancies in "minor details," HA had provided multiple consistent statements regarding Appellant's actions before, during, and after the offense. The military judge further concluded,

> [A] professional photograph is the sort of item that would be saved and would move with a family . . . . [Appellant] has been married to the same person and [is] still in the military. While 14 years is a long time, it is not an unreasonable duration in the context of retaining a family photograph. Furthermore, a family portrait displayed in a home is not of a nature that would compel a criminal to destroy or hide it; it is not contraband.

---

[10] Appellant does not assert the military judge erred with respect to the additional basis for the motion to suppress, and we find it unnecessary to address in this opinion.

The military judge additionally found that "suppression would not result in any great deterrence of future unlawful searches," and that the cost of suppression to the justice system would be "high."

**2. Law**

We review a military judge's ruling on a motion to suppress for an abuse of discretion, viewing the evidence in the light most favorable to the prevailing party. *United States v. Hernandez*, 81 M.J. 432, 437 (C.A.A.F. 2021) (citations omitted). The military judge's findings of fact are reviewed for clear error, but her conclusions of law are reviewed de novo. *United States v. Keefauver*, 74 M.J. 230, 233 (C.A.A.F. 2015) (citation omitted). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted). "A military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law." *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004).

"The Fourth Amendment guarantees servicemembers' right to 'be secure in their persons, houses, papers, and effects.'" *Hernandez*, 81 M.J. at 438 (quoting U.S. Const. amend. IV). "Consistent with the Fourth Amendment, [Mil. R. Evid.] 315(f)(1) mandates that all search authorizations must be based on probable cause." *Id.* "Probable cause to search exists when there is a reasonable belief that the . . . property[ ] or evidence sought is located in the place . . . to be searched." Mil. R. Evid. 315(f)(2).

"Timeliness informs probable cause." *United States v. Macomber*, 67 M.J. 214, 220 (C.A.A.F. 2009) (citing *United States v. Lopez*, 35 M.J. 35, 38 (C.M.A. 1992)). "Whether too long a period has elapsed from the time the facts are obtained until the search is authorized depends on many factors." *Lopez*, 35 M.J. at 38. Such factors "may include, but are not limited to, the location to be searched, the type of crime involved, the nature of the articles to be seized, and how long the crime has been continuing." *Macomber*, 67 M.J. at 220 (citing *Lopez*, 35 M.J. at 38).

"Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination." *United States v. Leon*, 468 U.S. 897, 914 (1984) (citations and internal quotation marks omitted). "A military judge reviews a magistrate's decision to issue a search authorization to determine whether the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Rogers*, 67 M.J. 162, 164–65 (C.A.A.F.

2009) (citation omitted). "A magistrate has a substantial basis to issue a warrant when, based on the totality of the circumstances, a common-sense judgment would lead to the conclusion that there is a fair probability that evidence of a crime will be found at the identified location." *Id.* at 165 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Leedy*, 65 M.J. 208, 213 (C.A.A.F. 2007)). "Close calls will be resolved in favor of sustaining the magistrate's decision." *United States v. Monroe*, 52 M.J. 326, 331 (C.A.A.F. 2000) (quoting *United States v. Maxwell*, 45 M.J. 406, 423 (C.A.A.F. 1996)).

Mil. R. Evid. 311(a) provides:

> Evidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against the accused if: (1) the accused makes a timely motion to suppress . . . ; (2) the accused had a reasonable expectation of privacy in the person, place, or property searched . . . ; and (3) exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system.

**3. Analysis**

On appeal, Appellant contends the military judged erred when she found probable cause existed for the 20 April 2015 search authorization. We disagree. Viewing the evidence in the light most favorable to the Government, we conclude the military judge did not abuse her discretion in finding the information presented to the military magistrate was not "stale" and therefore, by implication, a substantial basis existed for the military magistrate to find probable cause for the search. *See Rogers*, 67 M.J. at 164–65.

We agree with the military judge that there is no bright-line rule for determining the staleness of probable cause. Timeliness informs probable cause, but it is only one factor to be considered. In this case, the nature of the article sought—a professionally created family portrait Appellant had displayed on his living room wall—was of greater importance. Finding probable cause "merely requires that a person 'of reasonable caution' could believe that the search may reveal evidence of a crime; '*it does not demand any showing that such a belief be correct or more likely true than false.*'" *Hernandez*, 81 M.J. at 438 (internal quotation marks omitted) (quoting *United States v. Bethea*, 61 M.J. 184, 187 (C.A.A.F. 2005)). At the time of the search, Appellant and CC were still married and living together. As the military judge noted, the family portrait was neither consumable, contraband, nor apparent evidence of a crime. On the contrary, it was the type of item a family was likely to retain from move to move over many years. The military magistrate could reasonably

have believed that the agents were likely to find it when they searched Appellant's residence in April 2015.

Appellant relies on *United States v. Nieto*, 76 M.J. 101, 106 (C.A.A.F. 2017), to argue SA JD's affidavit was insufficient to supply probable cause. In *Nieto*, an Army Criminal Investigation Division agent seeking a search authorization for a phone and laptop computer cited his experience as an agent as to how individuals use portable digital media devices and store recordings of sexual acts. *Id*. at 105. In finding the search authorization lacked probable cause, the CAAF stated,

> [A] law enforcement officer's generalized profile about how people normally act in certain circumstances does not, standing alone, provide a substantial basis to find probable cause to search and seize an item in a particular case; there must be some additional showing that the accused fit that profile or that the accused engaged in such conduct.

*Id*. at 106 (citing *Macomber*, 67 M.J. at 220). Appellant contends that, as in *Nieto*, in the instant case there was no particularized showing that he fit the profile of how SA JD asserted, based on her "investigative experience and training," individuals tended to retain professional family photos.

Appellant's reliance on *Nieto* is unpersuasive. Whether probable cause exists is a multi-factored question, and the CAAF did not purport to hold that knowledge derived from an agent's expertise is essential to support such a determination.[11] Even if SA JD's reference to her experience and training is afforded little or no weight, the magistrate was free to apply his own experience and knowledge of the ways of the world to make a "common-sense judgment" as to whether Prosecution Exhibit 3 was likely to be found in Appellant's residence in April 2015. The military judge did not cite SA JD's experience and training in her analysis, and we do not rely on it either. For the reasons stated above, we find the military magistrate had a substantial basis to find probable cause existed regardless of SA JD's reference to her own training and experience.

Assuming *arguendo* the military magistrate lacked a substantial basis to find probable cause, we additionally agree with the military judge that suppression of Prosecution Exhibit 3 and derivative evidence was not warranted. SA JD evidently relied in good faith upon a facially valid search authorization

---

[11] We note the CAAF determination that the agent's "generalized profile about how servicemembers 'normally' store images" was "of little value" was largely based on its finding that his assertions were "technologically outdated" in the age of "smart phones." *Nieto*, 76 M.J. at 107.

issued by a proper authority. Moreover, we find no indication any error was the result of "recurring or systemic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). The deterrent value with regard to future unlawful searches would not outweigh the cost to the justice system by withholding highly relevant, material evidence from the trier of fact, impairing the truth-finding function of the court-martial and trust in the reliability of the military justice system. *See* R.C.M. 311(a)(3).

## D. Remote Testimony

### 1. Additional Background

During its case-in-chief, the Government presented the testimony of Dr. AF, the psychologist to whom HA made a restricted sexual assault report at Malmstrom AFB in 2011, by remote means, specifically via Skype, a commercial videoteleconferencing system. The Defense did not object to this procedure at any point, and the military judge did not make any inquiries or findings regarding the necessity or propriety of Dr. AF's testimony by remote means.

Dr. AF testified she had a meeting with HA at the Malmstrom AFB mental health clinic on 1 April 2011. Although Dr. AF could not recall the details of what HA said during their meeting, without objection she read from the notes she had made as past recollection recorded. Dr. AF testified HA told her HA had been sexually assaulted by an instructor when HA was in the National Guard between 2000 and 2003.[12] HA told Dr. AF she had gone to the emergency room and been involved in an investigation by the AFOSI. HA brought a picture of her graduation from the training that showed the black eye she had received during the assault. Dr. AF told HA that she would be referred to the SARC; HA told Dr. AF that she understood this, but "she did not want to be involved." At one point near the beginning of Dr. AF's testimony the military judge commented that the members could not hear Dr. AF, which evidently led trial counsel to adjust the volume and the bailiff to turn off a fan in the courtroom. At another point the military judge indicated the Skype connection was temporarily lost, but it was soon restored. The record does not indicate any gaps in the record of Dr. AF's testimony.

During her instructions on findings, the military judge advised the court members, "Dr. [AF] testified via Skype. When evaluating this witness's overall testimony you can consider the fact that you were unable to observe this witness's demeanor in court." The Defense did not object to this instruction.

---

[12] Dr. AF's notes indicated the assault occurred while HA was in training at Lackland AFB, Texas, rather than Sheppard AFB.

**2. Law**

We review a military judge's exercise of control over court-martial proceedings and the interrogation of witnesses for an abuse of discretion. *United States v. Brown*, 72 M.J. 359, 362 (C.A.A.F. 2013) (citations omitted). A party's failure to timely assert a right is forfeiture, which we review for plain error. *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (citing *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)). In a plain error analysis, the appellant "has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011) (citation omitted).

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. However, the Constitution does not require "an actual face-to-face encounter at trial in *every* instance in which testimony is admitted against a defendant." *Maryland v. Craig*, 497 U.S. 836, 847 (1990). The preference for face-to-face confrontation "must occasionally give way to considerations of public policy and the necessities of the case." *Id.* at 849 (internal quotation marks and citation omitted). "[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850 (citations omitted).

Rule for Courts-Martial 914b(a) provides: "The military judge shall determine the procedures used to take testimony via remote means. At a minimum, all parties shall be able to hear each other, those in attendance at the remote site shall be identified, and the accused shall be permitted private, contemporaneous communication with his counsel." "'Remote means' includes, but is not limited to, testimony by videoteleconference, closed circuit television, telephone, or similar technology." R.C.M. 914B(b).

**3. Analysis**

Appellant contends the military judge plainly erred by permitting Dr. AF to testify by remote means without making findings regarding necessity and reliability.[13] Reviewing for an abuse of discretion, we do not find the military judge plainly or obviously erred.

---

[13] The Government asserts Appellant waived this issue, pointing to a vague reference by trial counsel earlier in the proceedings to the existence of a stipulation of expected testimony of Dr. AF. The Government reasons that when Appellant agreed to such a stipulation, he abandoned his right to confront Dr. AF. However, no such stipulation

Under *Craig*, the Sixth Amendment establishes a preference for face-to-face testimony, but Appellant's right to in-person confrontation was not absolute. More to the point, although Appellant had confrontation *rights* under the Sixth Amendment, neither the Constitution nor any other law required him to exercise or enforce those rights. Defendants frequently decline to enforce such rights when, for example, they agree to stipulations of expected testimony, as Appellant himself did with regard to two other prosecution witnesses in this case. *See* R.C.M. 811. It is true that with respect to a stipulation, R.C.M. 811(c) requires the military judge to "be satisfied that the parties consent to its admission." However, Dr. AF's remote testimony, which permitted the court members to see and hear her as she testified, and which enabled cross-examination and questions by the court members, was much closer to in-court witness testimony than is the recitation of a stipulation of expected testimony. R.C.M. 914B(a) places responsibility on the military judge to ensure remote testimony is given under conditions that allow the participants to hear each other, that anyone present on Dr. AF's end was accounted for, and that Appellant could contemporaneously communicate with his counsel. However, R.C.M. 914B(b) does not require the military judge to make any specific findings before permitting remote testimony.

As the Government notes, in every federal civilian court decision Appellant cites the defendant objected to the absence of face-to-face confrontation at trial.[14] If Appellant wanted face-to-face confrontation with Dr. AF, the Defense could have objected to her testifying via Skype. The Defense did not object, and the military judge did not plainly err by failing to *sua sponte* question the Defense about this decision or make any other specific findings before allowing the testimony to proceed. Accordingly, no relief is warranted.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

---

was actually introduced, and Dr. AF testified live (albeit remotely) as described above. Whether the Defense contemplated agreeing to a stipulation at some earlier point in time is inapposite. We do not find the record supports a conclusion Appellant intentionally relinquished or abandoned a known right to object to Dr. AF testifying by remote means; rather, he simply did not assert it. *See Ahern*, 76 M.J. at 197.

[14] *See United States v. Quarterman*, 508 F.3d 306, 313 (5th Cir. 2007); *United States v. Yates*, 438 F.3d 1307, 1310 (11th Cir. 2006); *United States v. Boudreaux*, 400 F.3d 548, 552 (8th Cir. 2005); *United States v. Gigante*, 166 F.3d 75, 79 (2d Cir. 1999).

Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court